No. 20-1046

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

RFS POWER COALITION,

*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN,

*Respondents.*

On Petition for Review of Final Agency Action
of the Environmental Protection Agency

## INITIAL NEW OPENING BRIEF OF PETITIONERS

Bryan Killian
Douglas A. Hastings
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-3000
bryan.killian@morganlewis.com

*Counsel for Clean Fuels Alliance America*

David M. Lehn
Cesar Azrak
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727
dlehn@bsfllp.com

*Counsel for Growth Energy*

November 20, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, petitioners hereby certify the following as to parties, rulings, and related cases.

## I.    PARTIES AND AMICI

### A. Petitioners

Clean Fuels Alliance America; Growth Energy.

### B. Respondents

U.S. Environmental Protection Agency; Michael S. Regan, EPA Administrator.

### C. Intervenors

American Fuel & Petrochemical Manufacturers.

### D. Amici

There are no amici.

## II.    RULINGS UNDER REVIEW

Renewable Fuel Standard Program: Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7016 (Feb. 6, 2020).

## III.    RELATED CASES

There are no related cases.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners provide the following corporate disclosure statement:

Clean Fuels Alliance America is a trade association as defined in D.C. Circuit Rule 26.1(b).  It is the national trade association for the biodiesel and renewable diesel industry, and its mission is to advance the interests of its members by creating sustainable biodiesel and renewable diesel industry growth. Clean Fuels Alliance America has no parent companies, and no publicly held company has a 10% or greater ownership interest.  It has not issued shares or debt securities to the public.

Growth Energy is a non-profit trade association within the meaning of Circuit Rule 26.1(b).  Its members are ethanol producers and supporters of the ethanol industry.  It operates to promote the general commercial, legislative, and other common interests of its members.  It does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

GLOSSARY .................................................................x

INTRODUCTION ............................................................1

JURISDICTION.............................................................4

STATEMENT OF THE ISSUE..................................................4

STATUTE .................................................................4

STATEMENT OF THE CASE...................................................4

    A.    The RFS Program .................................................4

    B.    EPA's Pre-2020 Policy Regarding Accounting for Exemptions ..........7

    C.    The 2020 Rule ..................................................10

    D.    The Subsequent Exemption Denials and the 2022 Rule ....................12

    E.    The Resumption of This Case .........................................17

SUMMARY OF ARGUMENT ..................................................17

STANDING ...............................................................20

STANDARD OF REVIEW ....................................................27

ARGUMENT ..............................................................27

I.    EPA'S POLICY OF NOT ADJUSTING RFS STANDARDS TO MAKE UP PAST RETROACTIVE EXEMPTIONS IS UNLAWFUL.....................................27

    A.    EPA's Policy Violates Its Statutory Duty to Set Standards That "Ensure" That the Required Volumes Are Met ................................28

    B.    EPA's Policy Is Arbitrary and Capricious .........................33

C.    EPA's Policy Unlawfully Arrogates to Itself a Non-Textual Waiver Power ................................................................................. 35

II.    EPA's 2022 RFS RULEMAKING AND THE ENSUING LITIGATION DO NOT FORECLOSE THIS CHALLENGE ...................................................... 36

CONCLUSION ..................................................................................... 39

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## CASES

*Advanced Biofuels Ass'n v. EPA*
792 F. App'x 1 (D.C. Cir. 2019) .........................................................................10

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration*
41 F.4th 586 (D.C. Cir. 2022) ..............................................................................21

*Air Excursions LLC v. Yellen*
66 F.4th 272 (D.C. Cir. 2023) ..............................................................................22

*Alliance for Hippocratic Medicine*
602 U.S. 367 (2024) ...................................................................................... 20, 25

*Alon Refining Krotz Springs, Inc. v. EPA*
936 F.3d 628 (D.C. Cir.  2019) ...................................................................... 23, 26

*American Fuel & Petrochemical Manufacturers v. EPA*
937 F.3d 559 (D.C. Cir. 2019); ........................................................... 17, 21, 28-29

*American Fuel & Petrochemical Manufacturers v. EPA*
3 F.4th 373 (D.C. Cir. 2021) ............................................................................ 22-24

*American Maritime Ass'n v. United States*
766 F.2d 545 (D.C. Cir. 1985) ...................................................................... 20, 39

*Americans for Clean Energy v. EPA*,
864 F.3d 691 (D.C. Cir. 2017) ....................................... 19, 23, 25, 28, 31-32, 36

*Calumet Shreveport Refining, L.L.C. v. EPA*
86 F.4th 1121 (5th Cir. 2023) ....................................................................... 16, 38

*Carpenters Industrial Council v. Zinke*
854 F.3d 1 (D.C. Cir. 2017 ..................................................................................26

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Center for Biological Diversity v. EPA*
    56 F.4th 55 (D.C. Cir. 2022) .................................................................20

*Delta Construction Co. v. EPA*
    783 F.3d 1291 (D.C. Cir. 2015) ............................................................22

*Energy Future Coalition v. EPA*
    793 F.3d 141 (D.C. Cir. 2015) ..............................................................21

*Ethyl Corp. v. EPA*
    51 F.3d 1053 (D.C. Cir. 1995) ..............................................................36

*FDA v. Alliance for Hippocratic Medicine*
    602 U.S. 367 (2024) ...............................................................................20

*Growth Energy v. EPA*
    5 F.4th 1 (D.C. Cir. 2021) .....................................................................37

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*
    594 U.S. 382 (2021) ...............................................................................13

*Louie v. Dickson*
    964 F.3d 50 (D.C. Cir. 2020) ................................................................36

*Michigan v. EPA*
    576 U.S. 743 (2015) ...............................................................................23

*Mingo Logan Coal Co. v. EPA*
    829 F.3d 710 (D.C. Cir. 2016) ..............................................................36

*MOAC Mall Holdings LLC v. Transform Holdco LLC*
    598 U.S. 288 (2023) ......................................................................... 19, 36

*Monroe Energy, LLC v. EPA*
    750 F.3d 909 (D.C. Cir. 2014) ......................................................... 31-32

*Motor & Equipment Manufacturers Ass'n v. Nichols*
    142 F.3d 449 (D.C. Cir. 1998) ..............................................................39

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual
    Automobile Insurance Co.*
     463 U.S. 29 (1983) .......................................................................... 18, 33

vi

*National Biodiesel Board v. EPA*
    843 F.3d 1010 (D.C. Cir. 2016) .................................................................22

*National Lime Ass'n v. EPA*
    233 F.3d 625 (D.C. Cir. 2000).................................................................27

*\*National Petrochemical & Refiners Ass'n v. EPA*
    630 F.3d 145 (D.C. Cir. 2010) ........................................... 19, 31-32, 35

*New York Republican State Committee v. SEC*
    927 F.3d 499 (D.C. Cir. 2019) .................................................................26

*REH Co. v. EPA*
    Nos. 24-1310 & 24-1311 (D.C. Cir.) ......................................................38

*Renewable Fuels Ass'n v. EPA*
    No. 19-1220 (D.C. Cir.) ...........................................................................13

*Renewable Fuels Association v. EPA*
    948 F.3d 1206 (10th Cir. 2020) ...............................................................12

*Sandpiper Residents Ass'n v. HUD*
    106 F.4th 1134 (D.C. Cir. 2024) ..............................................................36

*\*Sinclair Wyoming Refining Co. LLC v. EPA,*
    101 F.4th 871 (D.C. Cir. 2024).................................... 5, 7-8, 11 14-18, 28-32, 34

*Sinclair Wyoming Refining Co. LLC v. EPA,*
    114 F.4th 693 (D.C. Cir. 2024).......................................................5-6, 13-16, 38

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014)..................................................................................26

*Union of Concerned Scientists v. Nuclear Regulatory Commission*
    711 F.2d 370 (D.C. Cir. 1983) .................................................................39

*United States v. Monzel*
    641 F.3d 528 (D.C. Cir. 2011) .................................................................36

*White Stallion Energy Center, LLC v. EPA*
    748 F.3d 1222 (D.C. Cir. 2014) ...............................................................23

## STATUTES

42 U.S.C.

§7545(*o*)(2)(A)(i) ........................................................................5

§7545(*o*)(3)(B) ............................................................................6

§7545(*o*)(3)(B)(i) .............................................................. 6, 28, 31

§7545(*o*)(9)(A)(ii)(II) ..................................................................7

§7545(*o*)(9)(B)(i) .........................................................................7

§7545(*o*)(7) ...............................................................................35

§7545(*o*)(7)(A) ...........................................................................36

§7545(*o*)(8)(D) ...........................................................................35

§7545(*o*)(9)(A)(i) ................................................................. 7, 35

§7545(*o*)(9)(B)(i). ................................................................ 7, 35

§7607(b)(1) ...................................................................................4

§7607(d)(9) .................................................................................27

Energy Independence and Security Act, Pub. L. No. 110-140, 121 Stat. 1492
(2007)).....................................................................................5

## REGULATIONS AND ADMINISTRATIVE MATERIALS

40 C.F.R. §80.1415 ....................................................................10

78 Fed. Reg. 49,794 (Aug. 15, 2013) ..........................................9

80 Fed. Reg. 77,420 (Dec. 14, 2015) .......................................3, 9

81 Fed. Reg. 89,746 (Dec. 12, 2016) ...........................................9

82 Fed. Reg. 58,486 (Dec. 12, 2017) ...........................................8

83 Fed. Reg. 63,704 (Dec. 11, 2018) ...........................................8

85 Fed. Reg. 7,016 (Feb. 6, 2020) .......................................................i, 4, 8-12, 29-30

87 Fed. Reg. 39,600 (July 1, 2022)................................................................... 15, 37

88 Fed. Reg. 44,468 (July 12, 2023).........................................................................25

Renewable Fuel Standard Program - Standards for 2020 and
   Biomass-Based Diesel Volume for 2021 and Other Changes: Response to
   Comments (Dec. 2019) ........................................................................................11

Renewable Fuel Standard (RFS) Program:
   RFS Annual Rules 2022 (June 2022) ........................................................... 15, 37

Growth Energy Comments, EPA-HQ-OAR-2019-0136-0312
   (Aug. 30, 2019) ............................................................................................ 9, 10

Clean Fuels Alliance America Comments, EPA-HQ-OAR-2019-0136-0451
   (Nov. 27, 2019) ...................................................................................................10

## SECONDARY AUTHORITIES

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (3d ed. 2002) .....................31

**GLOSSARY**

| | |
|---|---|
| Add. | Addendum |
| EPA | U.S. Environmental Protection Agency |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |

**INTRODUCTION**

Congress created the Renewable Fuel Standard ("RFS") program to force

the market to inject annually increasing amounts of renewable fuel into the

nation's supply of transportation fuel, in order to reduce greenhouse gas emissions,

enhance energy security, and promote economic development.  Each year, there is

an amount of renewable fuel that must be used nationally, and EPA is statutorily

mandated to set percentage-based standards that, when met by each petroleum

refiner and other "obligated party" under the program, will "ensure" that the

nationally required amount of renewable fuel is actually used.  EPA may exempt

individual obligated parties for a given year at any time, and EPA often does so

after it has set the percentage standards for the exempted year—so-called

"retroactive exemptions."

EPA and this Court have repeatedly recognized that when EPA grants

exemptions, it creates a renewable-fuel shortfall.  And accordingly, EPA and this

Court have recognized that EPA breaches its statutory "ensure" duty if it fails to

adjust a given year's percentage standards to account for exemptions granted for

*that year*, whether those exemptions were granted before it set the standards or

afterwards, i.e., retroactively.  Yet, EPA has decided as a policy matter that it will

not adjust its standards to account for retroactive exemptions granted for *prior*

1

*years* even if they were not previously accounted for in the standards set for those years.

EPA's split policy is unlawful.  The logic that compels EPA to adjust standards to make up exemptions for the same year also compels it to adjust standards to make up exemptions for past years.  Either way, the exemptions create a renewable-fuel shortfall, undermining the fundamental congressional purpose of the RFS program: increasing renewable-fuel use.  Only by making such an adjustment does EPA perform its duty to set standards that "ensure" that the national volume requirements will be met.  Indeed, EPA and this Court have repeatedly recognized that EPA's "ensure" duty applies "regardless of EPA delay"—EPA has repeatedly increased future standards to make up for past programmatic shortfalls, and each time, this Court has approved the adjustment.

Moreover, EPA's current policy forces EPA to set arbitrary and capricious standards by blinding itself to a central issue it faces when setting standards: the renewable-fuel shortfall from past retroactive exemptions.  And EPA's policy in effect impermissibly converts exemptions into a *waiver*—a textually distinct form of relief Congress provided for reducing national volume requirements under different limited circumstances.

Correcting EPA's policy is imperative.  When EPA re-adopted this policy while setting the 2020 RFS standards, the renewable-fuel shortfall from

2

unaccounted-for retroactive exemptions totaled about 4.73 billion gallons. Although EPA then revised its approach to adjudicating exemption applications such that it would be unlikely to grant more exemptions in the future, this Court and the Fifth Circuit have now vacated that revised approach. Consequently, EPA could grant many exemptions in the future long after the standards for the covered compliance years were set and long after those compliance years have ended. EPA will not adjust future standards to make up any of those exemptions under its current policy, enlarging the renewable-fuel shortfall.

Consequently, EPA's policy substantially undermines the RFS program's ability to achieve Congress's market-forcing objective and thus deprives the country of the statutory benefits it would gain from the billions of gallons of additional required renewable-fuel use. The policy is especially harmful given the fact that EPA nullified the RFS' market-forcing power for 4 of the previous 10 years, by setting the standards for 2014, 2015, 2020, and 2021 to the level of renewable fuel that the market had used independently of any RFS requirements. *See* JAXX:2-3{80.Fed.Reg.77430}; JAXX:1{87.Fed.Reg.39608}.

Finally, neither the need for nor ability of this Court to decide the validity of EPA's policy was diminished by EPA's decision in 2022 to revise the 2020 RFS standards. EPA did not withdraw the policy challenged here as re-adopted in 2020 or make up the past retroactive exemptions that had been granted (so far). Rather,

3

in the 2022 rulemaking, EPA simply reaffirmed its 2020 policy decision.  Thus, the petitions for review still present a timely, live, and consequential case.

## JURISDICTION

This case challenges a final EPA action under the Clean Air Act entitled *Renewable Fuel Standard Program: Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes* (Feb. 6, 2020), 85 Fed. Reg. 7016 (JA1-JAXX).  Petitioners' consolidated petitions were timely filed within 60 days of the action's publication.  This Court has jurisdiction under 42 U.S.C. §7607(b)(1).

## STATEMENT OF THE ISSUE

Whether EPA's policy of not increasing RFS annual standards to account for exemptions that EPA already granted for a prior year after the RFS standards for that year were set is lawful.

## STATUTE

The relevant statute appears in the Addendum.

## STATEMENT OF THE CASE

### A.    The RFS Program

Congress created the RFS program under the Clean Air Act "to force the market" to "replace" fossil fuel with "greater and greater volumes of renewable fuel each year." *Americans for Clean Energy v. EPA*, 864 F.3d 691, 696-697, 710 (D.C. Cir. 2017).  Congress adopted this market-forcing policy to "'move the

4

United States toward greater energy independence and security,'" "to reduce greenhouse gas emissions," and to promote "job creation … [and] rural economic development." *Americans for Clean Energy*, 864 F.3d at 696-697 (quoting Energy Independence and Security Act, Pub. L. No. 110-140, preamble, 121 Stat. 1492 (2007)); §7545(*o*)(2)(B)(ii)(I)-(II) & (VI).

To force the market to increase renewable-fuel use, the Act "requires refineries and other obligated parties to meet applicable volumes—mandatory and annually increasing quantities of renewable fuels that must be introduced into commerce in the United States each year." *Sinclair Wyoming Refining Co. LLC v. EPA*, 114 F.4th 693, 701 (D.C. Cir. 2024) (hereinafter "*Sinclair-Exemptions*") (quotation cleaned); *see* 42 U.S.C. §7545(*o*)(2)(A)(i). In other words, "[b]y requiring upstream market participants ... to introduce increasing volumes of renewable fuel into the transportation fuel supply, Congress intended the Renewable Fuel Program to be a market forcing policy that would create demand pressure to increase consumption of renewable fuel." *Sinclair Wyoming Refining Co. LLC v. EPA*, 101 F.4th 871, 877 (D.C. Cir. 2024) (hereinafter "*Sinclair-Reset*") (quotation cleaned). And the national "demand for renewable fuel will be a function of the renewable fuel standards." *Americans for Clean Energy*, 864 F.3d at 710 (quotation cleaned).

5

EPA's overarching "statutory mandate [is] to 'ensure' that [the national volume] requirements are met." *Americans for Clean Energy*, 864 F.3d at 698-699 (quoting §7545(*o*)(3)(B)(i); quotation cleaned).  EPA "fulfills that mandate by translating the annual volume requirements into percentage standards," which "represent the percentage of transportation fuel introduced into commerce that must consist of renewable fuel." *Id.* at 699; *see also* 42 U.S.C. §7545(*o*)(3)(B). "[O]bligated parties are responsible for ensuring that the renewable fuel volume requirements are met" by blending the required percentage of renewable fuel into the transportation fuel—gasoline or diesel—that they make and sell. *Americans for Clean Energy*, 864 F.3d at 705 (quotation cleaned).  Put another way, each obligated party must use its pro rata share of renewable fuel in proportion to the amount of transportation fuel it sells. *Id.* at 699.

Obligated parties show compliance by "retiring" the number of credits—called "RINs"—equal to their obligation. *Sinclair-Exemptions*, 114 F.4th at 701. Each RIN represents one gallon of renewable fuel.  40 C.F.R. §80.1415.  Obligated parties can obtain the necessary RINs by blending renewable fuel with petroleum or by buying RINs in a national market from others that have done so. *Sinclair-Exemptions*, 114 F.4th at 701-702.  Unused RINs may be "carried over" for compliance in the next year; the aggregate amount of these "carryover RINs" is called the "RIN bank." *Id.* at 702.

EPA may grant a "small refinery" (a refinery whose aggregate crude-oil throughput is below a specified level, §7545(*o*)(1)(K)) an "exemption" from its RFS obligations for a given year "for the reason of disproportionate economic hardship," §7545(*o*)(9)(A)(ii)(II), (B)(i). The effect of granting an exemption is that the RFS obligations "shall not apply to [that] refiner[y]" for that year. §7545(*o*)(9)(A)(i), (B)(i). EPA may grant an exemption for a given compliance year "at any time," including after EPA has set the national standards for that year and after that year has ended. §7545(*o*)(9)(B)(i); *see Sinclair-Reset*, 101 F.4th at 879.

### B.    EPA's Pre-2020 Policy Regarding Accounting for Exemptions

"By permitting some petroleum refiners to incorporate less renewable fuel into the gasoline and diesel they sell, small refinery exemptions can impede attainment of overall applicable volumes." *Sinclair-Reset*, 101 F.4th at 881 (quotation cleaned). "To avoid such a shortfall, EPA has long adjusted the percentage standards applicable to other petroleum refiners and importers to account for small refinery exemptions," by raising the percentage standards for all non-exempt obligated parties above the level that would exist absent the exemptions, so that if the non-exempt obligated parties comply, the national volume requirement will be met. *Id.* at 881, 890-891 (quotation cleaned).

However, before 2020, EPA's regulations called for this adjustment only with respect to exemptions that were "already [granted] by the time the [percentage standards were] promulgated" for the compliance year covered by the exemption. *Sinclair-Reset*, 101 F.4th at 881 (quotation cleaned); *see also, e.g.*, JAXX:1{2020.Rule.7050}. So, for example, when setting the 2019 percentage standards, EPA would (in theory) adjust them to account for the exemptions it had *already* granted *for 2019*. EPA would not adjust the standards to account for any exemptions it granted, or would grant, *after* the standards for the exempt year were already set—so-called "retroactive exemptions." *Sinclair-Reset*, 101 F.4th at 881.

"Without [such] further adjustment, those retroactive exemptions … hindered the achievement of the [national] renewable-fuel volumes." *Id.*; *see also* JAXX:1{2020.Rule.7050} ("As a result of this interpretation, any [exemptions] granted after we issued the annual rule containing the percentage standards for that year effectively reduced the required volume of renewable fuel for that year."); JAXX:3{2020.Rule.7050}. Indeed, this hindrance was massive. EPA has rarely granted exemptions before the standards were set for the exempted compliance year—the last time it did so was for the 2013 standards.[1] But EPA routinely

---

[1] *Compare* JAXX Table VII.C-1{83.Fed.Reg.63740} (no exemptions yet for 2019), JAXX Table VII.C-1{82.Fed.Reg.58524} (same for 2018), JAXX Table

granted large amounts of exemptions *retroactively*, "effectively reduc[ing]" the required national volume of renewable fuel use by 190 million gallons in 2013, by 210 million gallons in 2014, by 290 million gallons in 2015, by 790 million gallons in 2016, by gallons 1.82 billion in 2017, and by gallons 1.43 billion in 2018. JAXX:1{2020.Rule.7050}; *see* JAXX{EPA-HQ-OAR-2019-0136-0312.at.3-4}. For 2016, 2017, and 2018, those reductions accounted for 4%, 9%, and 7% of the total nationally required volumes.  *See* EPA, "Renewable Fuel Annual Standards," table[2]; JAXX{EPA-HQ-OAR-2019-0136-0312.at.3-4}.  All told, by the time EPA set the 2020 RFS standards, it had retroactively exempted 4.73 billion gallons of renewable fuel.

　　To make matters worse, EPA granted all these retroactive exemptions in secret (for 2018, EPA announced its decision without identifying the recipients of the exemptions), depriving interested renewable-fuel producers—such as those represented by petitioners here—of the chance to comment on the exemption applications or to challenge EPA's final exemption decisions.  It was not until "April 2018[ that the renewable-fuels industry] got wind of the spike in

─────────────────

VII.C-1{81.Fed.Reg.89801} (same for 2017), *and* JAXX Table V.B.3-1{80.Fed.Reg.77511} (same for 2016, 2015, or 2014), *with* JAXX Table IV.B.3-1{78.Fed.Reg.49826} (accounting for exemptions for 2013).

　　[2] https://www.epa.gov/renewable-fuel-standard-program/renewable-fuel-annual-standards.

exemptions [for 2016 and 2017] through media reports that disclosed the new statistics." *Advanced Biofuels Ass'n v. EPA*, 792 F. App'x 1, 3 (D.C. Cir. 2019). As this Court observed, the story of EPA's administration of exemptions "paint[s] a troubling picture of intentionally shrouded and hidden agency law" that generally left "those aggrieved by the agency's actions"—such as petitioners—"without a viable avenue for judicial review." *Id.* at 5.

### C.    The 2020 Rule

During the rulemaking to set the 2020 RFS standards, petitioners here asked EPA to revise its policy so that it would begin accounting for all retroactive exemptions when setting RFS standards by adjusting the standards for both the retroactive exemptions expected to be granted for the same compliance year and the retroactive exemptions already granted for past compliance years. JAXX{EPA-HQ-OAR-2019-0136-0312.at.9-16}; JAXX{EPA-HQ-OAR-2019-0136-0451.at.2-3}.  In response, EPA "revisit[ed]" the question. JAXX:2{2020.Rule.7050}.  EPA decided to modify the formula for computing the percentage standards to "account for a projection of the total exempted volume of gasoline and diesel produced at small refineries [during the upcoming compliance year], *including for those exemptions granted after the final annual rule*." JAXX:3-JAXX:2{2020.Rule.7049-7050 (amending 40 C.F.R. §80.1405(c)) (emphasis added).  In other words, EPA decided that henceforth, when setting RFS

10

annual standards for a given compliance year, it would adjust the standards to account not only for all exemptions already granted for that year (as it had been doing) but also for all exemptions projected to be granted for that year.  *See Sinclair-Reset*, 101 F.4th at 890-891.  EPA explained its reason for the "change in policy": "These higher percentage standards would have the effect of ensuring that the required volumes of renewable fuel are met when small refineries are granted exemptions from their [RFS] obligations after the issuance of the final rule, provided EPA's projection of the exempted volume is accurate." JAXX:3{2020.Rule.7050}.

On the other hand, EPA decided to adhere to its policy of *not* adjusting the standards to account for any retroactive exemptions granted for *prior* years that it had not previously accounted for in prior years' standards.  EPA stated: "[W]e are not modifying the percentage standards to account for [exemptions granted] after setting the percentage standards in November of the prior year.  Nor are our standards meant to account for [retroactive exemptions] granted in past years. JAXX{2020.RTC.172}; *see also* JAXX{2020.RTC.191} ("we are not reallocating prior exempted volumes for the 2016-18 (or 2012-15) compliance years in today's action").  Therefore, EPA's revised policy only partially accounted for retroactive exemptions.

11

Applying its new formula, EPA adjusted the 2020 percentage standards to account for the gasoline and diesel it had already exempted for 2020 and the gasoline and diesel it projected would be exempt for 2020. JAXX:2-XX:3{2020.Rule.7051-7053}. These adjustments increased the 2020 percentage standards (applicable to all non-exempt obligated parties) to avoid a predictable renewable-fuel shortfall of 770 million gallons. JAXX:3{2020.Rule.7053}. But EPA did not adjust the 2020 standards to account for the 4.73 billion gallons of renewable fuel it had exempted retroactively for earlier compliance years.

Petitioners sought review of the 2020 Rule. Although petitioners supported EPA's new policy of increasing RFS standards to account for projected retroactive exemptions, petitioners objected to EPA's reaffirmation of its policy of *not* increasing RFS standards to account for *past* retroactive exemptions that had not previously been accounted for and to EPA's application of that policy in setting the 2020 standards. *See* Initial Br. for the Biofuels Petitioners, Pt. I, ECF #1882940 (Jan. 29, 2021).

### D.    The Subsequent Exemption Denials and the 2022 Rule

Meanwhile, based on media reports, some renewable-fuels associations identified the recipients of 3 exemptions for 2016 and 2017, and challenged those exemptions in the Tenth Circuit. *Renewable Fuels Association v. EPA*, 948 F.3d 1206 (10th Cir. 2020). While that case was pending, EPA publicly announced in

12

August 2019 its decision granting dozens of retroactive exemptions for 2018. *See Sinclair-Exemptions*, 114 F.4th at 716. Some renewable-fuels associations (including petitioner Growth Energy) challenged that decision in this Court. *Renewable Fuels Ass'n v. EPA*, No. 19-1220 (D.C. Cir.). The Tenth Circuit rejected EPA's approach to evaluating exemption petitions on three grounds, but the Supreme Court granted certiorari to review one of them. *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382 (2021).

This Court held this case and the case challenging the 2018 exemptions in abeyance pending the Supreme Court's decision in *HollyFrontier*. Order, ECF #1892343 (Mar. 30, 2021); *see Sinclair-Exemptions*, 114 F.4th at 716. The Supreme Court then reversed the Tenth Circuit's decision on the one ground before it. In light of the Tenth Circuit's and Supreme Court's decisions, this Court remanded the 2018 exemptions to EPA. *Sinclair-Exemptions*, 114 F.4th at 716.

Next, in its response brief in this case, EPA asked the Court to remand the 2020 Rule because EPA "intend[ed] to reconsider the challenged parts of the 2020 Rule." Initial Br. for Respondents at 28, ECF #1925941 (Dec. 8, 2021). EPA explained that the Tenth Circuit's decision rejecting EPA's lax approach to evaluating exemption petitions—a decision that largely remained intact after the Supreme Court's decision in *HollyFrontier*—"created uncertainty about" the "large number" of projected 2020 retroactive exemptions on which EPA had based

13

the 2020 standards.  *Id.* at 29-31.  EPA contemporaneously issued a notice of proposed rulemaking to revise the 2020 standards.

EPA's proposed revision of the 2020 standards prompted obligated-party petitioners to ask the Court to hold this case in abeyance until that rulemaking had concluded, *see* ECF #1929726 (Jan. 7, 2022), and prompted certain biofuels petitioners to ask the Court to remand the 2020 Rule without vacatur with direction that EPA issue revised 2020 standards by a date certain, *see* ECF #1929915 (Jan. 10, 2022).  The Court held the case in abeyance, including the biofuels petitioners' motion for remand without vacatur, Order, ECF #1934323 (Feb. 8, 2022), and then extended the abeyance, Order, ECF #1940069 (Mar. 22, 2022); Order, ECF #1958977 (Aug. 11, 2022).

In April and June 2022, EPA announced its revised policy for adjudicating exemptions and, under that policy, denied all pending exemption applications—more than 100 in all, including the three 2016-2017 exemptions that had been addressed in the Tenth Circuit case and all the 2018 exemptions that had been remanded by this Court.  *See Sinclair-Exemptions*, 114 F.4th at 704.  In those denial actions, EPA stated that its new exemption "policy would likely lead to the rejection of all small refinery exemption applications" in the future, too.  *Sinclair-Reset*, 101 F.4th at 892.  Coupled with those denials were so-called "alternative compliance actions" by which EPA excused the small refineries of the same 2016-

14

2018 RFS obligations from which EPA had declined to exempt them—in effect, retroactively re-granting the denied exemptions. *Sinclair-Exemptions*, 114 F.4th at 700.

EPA concurrently issued a new rule revising the percentage standards for 2020 ("2022 Rule"). In that rule, EPA "reaffirm[ed] the regulatory change to the percentage standard formulas from the 2020 final rule, which account[s] for a projection of the aggregate volume for [exemptions] that [EPA] expect[s] to grant for each compliance year." JAXX:1{2022.Rule.39,631}; *see* JAXX{2022.Rule.39,631-39,633}; *Sinclair-Reset*, 101 F.4th at 881, 890. EPA also reaffirmed its policy of *not* adjusting RFS standards to account for previously granted retroactive exemptions that had never been accounted for. JAXX, XX-XX{2022.RTC.138,140-141} ("we do not believe we should account for past SREs by increasing the volumes"). Thus, EPA reduced the 2020 standards to reflect EPA's new expectation that it would grant zero exemptions for 2020 under its new exemption policy, without making any adjustment for the 4.73 billion RINs covered by the past retroactive exemptions. JAXX:1-2{2022.Rule.39,633}. (For the same reason, EPA projected zero exemptions for 2021 and 2022, and accordingly made no adjustment to the standards it set concurrently for those years. JAXX:2-3{2022.Rule.39,633}.)

15

Petitions for review of the 2022 Rule and of the April and June 2022 exemption actions were filed in this Court.  In response, the Court extended the abeyance of this case pending decision in those cases.  Order, ECF #1968062 (Oct. 7, 2022).

On petitions for review of the 2022 Rule, this Court rejected obligated parties' challenge to EPA's policy of adjusting the percentage standards to account for *projected* retroactive exemptions.  The Court reasoned that EPA's statutory mandate "to promulgate regulations to 'ensure' that the applicable volumes 'are met'" vests EPA with "the statutory authority to account for small refinery exemptions on a prospective basis."  *Sinclair-Reset*, 101 F.4th at 892.  No party raised, and the Court did not address, the issue raised by petitioners in this case, i.e., whether EPA's policy of *not* adjusting percentage standards to account for previously granted retroactive exemptions is lawful.

Subsequently, the Fifth Circuit and this Court invalidated EPA's new approach to evaluating exemption petitions and consequently vacated EPA's 2022 exemption actions, including EPA's denial of the 2016-2018 exemptions that had been remanded by the Tenth Circuit and this Court.  *Sinclair-Exemptions*, 114 F.4th at 706-714; *Calumet Shreveport Refining, L.L.C. v. EPA*, 86 F.4th 1121, 1137-1142 (5th Cir. 2023).  If EPA now grants the exemptions on remand, none of the associated renewable-fuel use will be made up under EPA's existing policy,

16

given that all those exemptions will have been granted after the RFS standards were set for the covered compliance years.

### E.    The Resumption of This Case

After the Court had concluded the cases involving the 2022 Rule and the 2022 exemption denials, it lifted the abeyance in this case and ordered the biofuels petitioners to file a new brief addressing not only their merits issues but also their January 2022 motion for remand without vacatur.  Order, ECF #2082015 (Oct. 25, 2024).  Now that EPA has issued final revised 2020 standards (via the 2022 Rule), that motion for remand should be dismissed as moot.

### SUMMARY OF ARGUMENT

I.    EPA's policy of not adjusting RFS standards to make up past retroactive exemptions is unlawful.  First, the policy violates EPA's "statutory mandate to 'ensure[]' that [the national volume] requirements are met" by setting percentage standards that will achieve those volumes.  *Americans for Clean Energy*, 864 F.3d at 698-699.  Whenever EPA grants an exemption without adjusting the standards to account for the exemption, the exemption creates a "renewable-fuel shortfall," "imped[ing] attainment of overall applicable volumes." *American Fuel & Petrochemical Manufacturers v. EPA*, 937 F.3d 559, 571, 588 (D.C. Cir. 2019); *accord Sinclair-Reset*, 101 F.4th at 881.  EPA has therefore recognized that to fulfill its "ensure" duty, it must adjust the standards to account

17

for exemptions.  EPA has adopted a policy of doing so for the exemptions already granted and projected to be granted for the same year for which it is setting standards, and this Court has approved such adjustment so far as it goes.  *Sinclair-Reset*, 101 F.4th at 891-893.  But the same logic requires that EPA also adjust the standards to account for retroactive exemptions EPA granted for prior compliance years.  Nothing in the statute allows EPA to pick and choose which exemptions to make up or places a temporal limit on its ensure duty.  On the contrary, this Court has repeatedly "made clear that EPA must ensure the applicable volumes are met, regardless of EPA delay."  *Sinclair-Reset*, 101 F.4th at 893 (quotation cleaned).

Second, the policy results in arbitrary and capricious standards.  When setting RFS standards, EPA must "consider [all] important aspect[s] of the problem."  *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).  EPA's policy, however, leads EPA to disregard an important issue when setting standards: how the achievement of the required volumes is affected by past retroactive exemptions.  EPA knows about its past retroactive exemptions, knows that they create a renewable-fuel shortfall, and knows that it has the tools to make up that shortfall.  EPA cannot then adopt a policy of blinding itself to this reality and unnecessarily set standards it knows will not fulfill its ensure duty.

18

And third, the policy converts exemptions into a waiver, contrary to the statute.  Congress authorized EPA to "reduce" such requirements "only" in the "limited circumstances" specified in the statutory provisions for a "waiver." *National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 149 (D.C. Cir. 2010).  But refusing to account for exemptions does not merely relieve the exempted parties of their obligations; it also effectively reduces the nationwide volume requirements and thus EPA's policy functions as another waiver.  EPA cannot arrogate to itself an atextual waiver power.  Congress would not have used "exemption" to mean the same as "waiver."  Nor would it have "established the severe-harm waiver standard only to allow waiver" through exemptions "based on lesser degrees of economic harm." *Americans for Clean Energy*, 864 F.3d at 712 (quotation cleaned).

II.     EPA's 2022 RFS rulemaking and the ensuing litigation do not foreclose this challenge.  "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295 (2023) (quotation cleaned).  Petitioners' challenge to the 2020 percentage standards as being too low because of EPA's failure to account for past retroactive exemptions in setting those standards is now moot in light of EPA's revision of those standards through the 2022 Rule.  But the 2022 Rule did not moot petitioners' challenge to EPA's

19

decision in the 2020 rulemaking to maintain its policy of not making up past

retroactive exemptions because the 2022 Rule neither withdrew the unlawful 2020

policy nor even made up any past retroactive exemptions, but rather merely

"reaffirm[ed]" the 2020 policy.  *See American Maritime Ass'n v. United States*,

766 F.2d 545, 554 (D.C. Cir. 1985).

## STANDING

Petitioners are associations of producers of the renewable fuels used to

comply with the RFS.  "Associational standing requires that (1) at least one

member of the association has standing to sue in her own right (based on a

showing of harm, causation, and redressability), (2) the interests the association

seeks to protect by suing on its members' behalf are germane to its purpose, and

(3) neither the asserted claim nor the relief requested requires individual members

to participate in the litigation."  *Center for Biological Diversity v. EPA*, 56 F.4th

55, 66 (D.C. Cir. 2022).  For an individual member to have standing, it would have

to "demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii)

that the injury likely was caused or will be caused by the defendant, and (iii) that

the injury likely would be redressed by the requested judicial relief."  *FDA v.*

*Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024).  "When multiple

petitioners seek common relief, [the Court has] jurisdiction as long as one of the

petitioners has standing." *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration*, 41 F.4th 586, 592 (D.C. Cir. 2022).

A.    At least one member of at least one petitioner—but really all members of both petitioners—plainly has standing here.  This follows from this Court's precedent and the basic mechanics of the RFS.

1.    Member producers have standing as the direct object of the challenged policy action.  Although RFS "annual standards" nominally obligate petroleum refiners, they also "directly regulate biofuel producers" by mandating the amount of renewable fuel that must be supplied and used.  *American Fuel*, 937 F.3d at 595.  Renewable-fuel producers, therefore, are also the direct object of the challenged policy action because the action fixes the level of RFS annual standards by determining whether to increase them to make up past retroactivity exemptions.  In this situation, there is "little question" that renewable-fuel producers "have standing."  *Energy Future Coalition v. EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (Kavanaugh, J.) (quotation cleaned) (although "regulation [prohibiting use of certain biofuel in vehicles] is technically directed at vehicle manufacturers," biofuel producers were also "an object of the action").

2.    Member producers also have standing under the competitor-standing doctrine.  This doctrine "recognizes that economic actors suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or

21

otherwise allow increased competition." *American Fuel & Petrochemical Manufacturers v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021) (quotation cleaned). "To invoke competitor standing," a plaintiff must show, first, "that the challenged government action results in an actual or imminent increase in competition." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279-280 (D.C. Cir. 2023) (cleaned up). "Agency action may increase competition, for example, if it allows new entrants into a fixed regulated market." *Id.* at 280. Second, a plaintiff must show that it "is in fact a *direct* and *current* competitor in that market." *Id.* And "[w]ith injury established, the rest of the standing inquiry ordinarily falls into place: the increased competition is caused by the agency's action and redressed by restoring the regulatory *status quo ante*." *American Fuel*, 3 F.4th at 379.

No further evidence regarding how third parties will respond or how that response will affect the plaintiff is required under the doctrine. *See, e.g.*, *National Biodiesel Board v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016) (standing of Clean Fuels Alliance America, then known as the National Biodiesel Board, was "self-evident" because EPA action "incentivize[d] importation of renewable fuels that will compete with domestic production, and an order vacating that [action] would eliminate the resultant competitive harm"); *Delta Construction Co. v. EPA*, 783 F.3d 1291, 1299-1300 (D.C. Cir. 2015) (fuel company's standing was "self-evident" because challenged action "incentivizes other renewable fuels to the

detriment of [its] interests"); *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222, 1256 (D.C. Cir. 2014) (gas company's standing was "self-evident" because challenged action declined to require "fuel switching" from coal to gas), *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015).

Petitioners' member producers clearly satisfy this standard. Producers of petroleum products currently "compete with biofuel producers in the motor vehicle fuel market because ethanol is a substitute for the traditional petroleum-based components of gasoline." *American Fuel*, 3 F.4th at 379; Skor Decl. ¶4 (Add.10); Kovarik Decl. ¶3 (Add.14). The RFS "mandat[es] the replacement—at least to [the specified] degree—of fossil fuel with renewable fuel" in transportation fuel, thus defining a regulatory zone in which petroleum is barred from competing with renewable fuel. *Americans for Clean Energy*, 864 F.3d at 696. By suppressing RFS standards, the challenged policy shrinks that zone, necessarily lifting the restriction on competition and exposing renewable-fuel producers to increased competition from petroleum producers. Correspondingly, this competitive injury would be redressed by instead adopting petitioners' proposed policy, under which EPA would increase RFS standards to make up for past retroactive exemptions.

Indeed, in *Alon Refining Krotz Springs, Inc. v. EPA*, this Court held that petitioner Clean Fuels Alliance America had standing to challenge an RFS standard as too low. 936 F.3d 628, 665 (D.C. Cir. 2019). The Court explained:

23

RFS standards create "a market for compelled buyers" of qualifying renewable fuel, and "by establishing the … volume requirement at a level lower than … the expected production of [the petitioner's type of] diesel, EPA was creating the potential for some competition between [that] diesel and other [fuels] … and providing incentives for the continued development of those competitors' fuels." *Id.* (quotation cleaned). Precisely the same is true here.

Similarly, this Court held that petroleum refiners' standing was self-evident to challenge an EPA action permitting gasoline containing 15% ethanol (E15) to be sold during the summer instead of the standard 10% (E10). *American Fuel*, 3 F.4th at 379-380. The Court's analysis was simple: (1) petroleum refiners "compete with biofuel producers"; (2) allowing E15 during the summer "is substantially likely to increase demand for E15"; and (3) because E15 contains more ethanol than E10, "[i]ncreased production of E15 is, in turn, likely to cause a significant rise in demand for ethanol and a significant reduction in demand for petroleum." *Id.* Again, the same logic applies here because raising the RFS standards to account for past retroactive exemptions would raise the national percentage of transportation fuel that must be renewable fuel, much like the shift from E10 to E15.

3. Finally, member producers also have standing because the challenged policy will reduce sales of their product. The national "demand for renewable fuel

will be a function of the renewable fuel standards." *Americans for Clean Energy*, 864 F.3d at 710 (quotation cleaned). Again, the challenged policy suppresses those standards, reducing the amount of renewable fuel that obligated parties are required to buy—currently, by about 4.73 billion gallons and potentially much more. *Supra* pp.8-9; *infra* pp.37-38. Because member producers could meet higher levels of demand—indeed, their production levels already exceed current RFS levels, *see* JAXX:1-2, JAXX:2, Table III.B.5-1{88.Fed.Reg.44488,44489,44491}—the challenged policy's suppression of demand inevitably results in lost renewable-fuel sales.

That is so even though the purchasers of renewable fuel are third parties— obligated parties—because those parties are *required* by the RFS to purchase at least the amount specified by the RFS standards. If EPA revised its policy to increase RFS standards to account for past retroactive exemptions, that would necessarily require obligated parties to buy more renewable fuel, predictably increasing renewable-fuel sales. Correspondingly, discarding EPA's policy in favor of petitioners' would redress the injury. This "predictable chain of events leading from the government action to the asserted injury" suffices for standing. *Alliance for Hippocratic Medicine*, 602 U.S. at 384.

It is irrelevant that petitioners do not represent 100% of the producers of RFS-qualifying renewable-fuel. Growth Energy's members' renewable fuel is

25

used to meet about two-thirds of the "conventional" RFS requirement annually and about half of all renewable fuel used to meet the RFS requirements annually.  Skor Decl. ¶8 (Add.11).  Clean Fuels Alliance America's members' renewable fuel is used to meet over 60 percent of the biomass-based diesel RFS requirement annually.  Kovarik Decl. ¶16 (Add.17-18).  Therefore, the challenged policy creates at least "a 'substantial risk' that the anticipated harm will occur" specifically to petitioners' members. *New York Republican State Committee v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Further, it is enough if EPA's policy would cause a member to lose the sale of even a single gallon of renewable fuel because "the amount [of economic harm] is irrelevant … for standing purposes." *Carpenters Industrial Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017 (citing *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017)).

And, as this Court said when finding that Clean Fuels Alliance America had standing to challenge an RFS standard, "there is no need to identify injured members [because] all the members … are affected by the challenged activity" in the same way.  *Alon*, 936 F.3d at 665 (quotation cleaned).  Petitioners' members make interchangeable commodities and so they all will face the same, undifferentiated increase in competition and reduction in mandatory demand as a

result of EPA's policy.  Skor Decl. ¶¶6, 9-10 (Add.10-11); Kovarik Decl. ¶17 (Add.17).

B.    Protecting and promoting the demand for renewable fuel is petitioners' *raison d'être*.  Skor Decl. ¶2 (Add.9); Kovarik Decl. ¶4 (Add.14); *see National Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000).  And the validity of EPA's policy of not making up past retroactive exemptions can be adjudicated without the participation of their members.

## STANDARD OF REVIEW

Under the Clean Air Act, the Court "may reverse" if the action is "in excess of statutory jurisdiction, authority, or limitations, … short of statutory right," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  42 U.S.C. §7607(d)(9).

## ARGUMENT

### I.    EPA'S POLICY OF NOT ADJUSTING RFS STANDARDS TO MAKE UP PAST RETROACTIVE EXEMPTIONS IS UNLAWFUL

In the 2020 rulemaking, EPA decided to continue its policy of not adjusting RFS standards to account for retroactive exemptions granted for prior years.  This policy is unlawful for three principal reasons.  It violates EPA's statutory duty to set RFS standards that will "ensure" that the volume requirements are met.  It results in arbitrary and capricious standards because it leads EPA to disregard an important issue: how the achievement of the required volumes is affected by past

27

retroactive exemptions.  And it converts exemptions into a waiver, contrary to the statute.

These errors are underscored by the two recent decisions of this Court that triggered the end of the abeyance in this case: *Sinclair-Reset*, which recognized that "EPA has the authority to adjust the percentage standards to account for small refinery exemptions" and that "EPA must ensure the applicable volumes are met, regardless of EPA delay."  101 F.4th at 893 (quotation cleaned); and *Sinclair-Exemptions*, which invalidated EPA's 2022 exemption actions and thus potentially increased the magnitude of the harm to the RFS caused by EPA's current policy.

### A.    EPA's Policy Violates Its Statutory Duty to Set Standards That "Ensure" That the Required Volumes Are Met

"After EPA determines the volume requirements for the various categories of renewable fuel," "it has a 'statutory mandate' to 'ensure[]' that those requirements are met" by setting percentage standards that will achieve those volumes.  *Americans for Clean Energy*, 864 F.3d at 698-699 (quoting §7545(*o*)(3)(B)(i)).  EPA's policy violates this duty by refusing to adjust RFS standards to account for past retroactive exemptions.

1.    If EPA does not "adjust renewable fuel obligations to account for exemptions," it creates a "renewable-fuel shortfall," "imped[ing] attainment of overall applicable volumes."  *American Fuel*, 937 F.3d at 571, 588; *accord Sinclair-Reset*, 101 F.4th at 881; *see supra* pp.7-9.  Recognizing that fact, EPA has

28

for years "raise[d] the percentage standard" for a given year to account for the exemptions "that were granted … before [it] established the percentage standard for that year." *American Fuel*, 937 F.3d at 588; *accord Sinclair-Reset*, 101 F.4th at 881, 890-891.  That solution, however, was "only partial" because it did "not … account for small refinery exemptions granted after [EPA] promulgates percentage standards for that year—so-called retroactive exemptions." *American Fuel*, 937 F.3d at 588.

In the 2020 Rule, EPA finally recognized that to fulfill its "ensure" duty, it must also adjust the standards to account for retroactive exemptions—but it did so only with respect to the retroactive exemptions it projected it would grant for the compliance year for which it was setting standards.  JAXX:3{2020.Rule.7049}; *supra* pp.10-11.  EPA correctly explained that "should [it] grant [exemptions] without accounting for them in the percentage formula, those exemptions would effectively reduce the volumes of renewable fuel required by the RFS program, potentially impacting renewable fuel use in the U.S."  JAXX:3{2020.Rule.7050}.  Raising the standards to account for projected retroactive exemptions, EPA declared, has "the effect of ensuring that the required volumes of renewable fuel are met when small refineries are granted exemptions from their [RFS] obligations after the issuance of the final rule."  *Id.*

In *Sinclair-Reset*, this Court approved EPA's policy insofar as it adjusts standards to account for retroactive exemptions and the validity of EPA's rationale for doing so. In rejecting refiners' challenge to that policy, the Court recognized that EPA's statutory duty "to 'ensure' that the applicable volumes 'are met'" supplies EPA with "the authority to adjust the percentage standards to account for small refinery exemptions." 101 F.4th at 891, 893. EPA's adjustment for projected retroactive exemptions "helps prevent *undercompliance* by ensuring that the leeway afforded to small refineries does not lead to percentage standards that undershoot the target renewable fuel requirements." *Id.*

The problem with the adjustment policy EPA adopted through the 2020 Rule is that—although undoubtedly an improvement from its previous policy—it still only partially satisfies the "ensure" duty. As EPA explained, granting retroactive exemptions without accounting for them in any annual RFS standards—as it did for all retroactive exemptions granted before 2020 and may do again—also "effectively reduce[s] the required volume of renewable fuel." JAXX:1{2020.Rule.7050}. Thus, the sound premises of EPA's analysis, which *Sinclair-Reset* confirmed, imply more remediation than EPA has allowed: they require EPA to also adjust RFS standards to account for *past* retroactive exemptions. EPA's refusal to do that violates its "ensure" duty.

30

This Court has repeatedly recognized is EPA's ensure duty is a "statutory mandate." *Sinclair-Reset*, 101 F.4th at 895; *Americans for Clean Energy*, 864 F.3d at 698-699 (quoting *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 920 (D.C. Cir. 2014). And that mandatory duty is unqualified. As this Court has said, "ensure" as Congress used it in this context requires EPA to "make certain" that the "applicable volume" requirements are met by the percentage standards it sets. *National Petrochemical*, 630 F.3d at 153; *see also Ensure*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 756 (3d ed. 2002) ("make sure, certain, or safe"). EPA cannot pick and choose whether and to what extent to fulfill its ensure duty; if it is deliberately setting volumes that will functionally require less renewable fuel because of exemptions, it is not "making certain" that those volumes are met.

2.      EPA's duty to set standards that ensure the required volumes are met does not disappear just because the exemption year was in the past. On the contrary, making up past retroactive exemptions best reflects Congress' intent and is essential to the success of the RFS program.

The statutory ensure duty refers broadly to "Paragraph 2," which covers all RFS compliance years, and therefore the ensure duty applies to all years. §7545(o)(3)(B)(i). Nothing in the statute limits the ensure duty temporally. Rather, this Court has repeatedly "made clear that EPA must ensure the applicable volumes are met, 'regardless of EPA delay.'" *Sinclair-Reset*, 101 F.4th at 893

(quoting *Monroe Energy*, 750 F.3d at 920 (quoting *National Petrochemical*, 630 F.3d at 163)).  "Therefore, EPA may increase later year volumes to make sure that volumes that should have been met in earlier years "are eventually sold or introduced into commerce."  *Id.*  Thus, in *Sinclair-Reset*, for example, the Court approved EPA's decision to raise the 2022 standards to make up for a past renewable-fuel shortfall in 2016 created by EPA's unlawful waiver.  *Id.* at 893-895.

In concluding that EPA's ensure duty applies across compliance years, the Court recognized that raising future standards to make up missed past volume requirements because of programmatic actions "best … carr[ies] out Congress' mandate that [EPA] 'ensure' the applicable volume requirement for [the past year] is met."  *National Petrochemical*, 630 F.3d at 163, 166; *see id.* at 153 n.23, 155-156, 158.  Indeed, *not* "eventually" raising future standards to make up missed past volumes would be "'flatly contrary to Congress' intent.'"  *Id.* at 156-157; *see also Monroe Energy*, 750 F.3d at 916, 919-921.  By refusing to make up *all* exemptions it grants retroactively, EPA thwarts Congress' objective in creating the RFS to "force the market to create ways to produce and use greater and greater volumes of renewable fuel each year."  *Americans for Clean Energy*, 864 F.3d at 710.

### B.    EPA's Policy Is Arbitrary and Capricious

EPA's policy of refusing to account for past retroactive exemptions in setting RFS standards is arbitrary and capricious.  In setting RFS standards, EPA must "consider [all] important aspect[s] of the problem" and "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (quotation marks omitted).  EPA's policy results in RFS standards that fail to meet this standard of reasoned decisionmaking.

As explained above, EPA knows it has a statutory duty to set standards that will ensure that the required volumes of renewable fuel will be used.  *Supra* pp.10-11, 28-30.  Moreover, EPA knows it has a statutory duty and power to raise standards to account for past programmatic shortfalls, as shown by the many occasions when it raised future standards to make up such shortfalls.  *Supra* pp.31-32.

The implication is inescapable: when EPA sets RFS standards without accounting for past retroactive exemptions that have not been made up yet, it knowingly sets standards that will not ensure that the required volumes of renewable fuel are used.  In other words, EPA's current policy requires EPA to blind itself to a critical problem when setting standards, resulting in standards that

33

cannot be rationally justified by the evidence before it.  Thus, EPA's current policy yields standards that are arbitrary and capricious.

This is not to say that EPA must boost future standards to make up for all past shortfalls.  As the Court recently explained, "imprecision is inherent in the statute."  *Sinclair-Reset*, 101 F.4th at 892.  But the imprecision that Congress tolerated relates to EPA's factual projections: "An EPA projection that turns out to be off the mark does not retroactively" mean EPA did not fulfill its ensure duty. *Id.* at 892.  Such imprecision is "a technical error inherent in the nature of projecting events that have yet to occur."  *Id.* at 895.  That situation is "materially different" from one in which EPA refuses to adjust standards to make up for shortfalls it *knows* exist.  *Id.*  EPA's task is to set standards that are reasonably designed to cause the market to use the statutorily specified volume of renewable fuel.  EPA fails to do so when it intentionally disregards shortfalls created by its own programmatic actions, including prior retroactive exemptions.[3]

---

[3] When adjusting standards to account for past retroactive exemptions, EPA must (under this Court's precedent) still "reasonably consider[] and mitigate[] any hardship caused to obligated parties by reason of the lateness."  *Sinclair-Reset*, 101 F.4th at 887.  EPA can fulfill that duty by spreading out the makeup volume across multiple compliance years if necessary, as it did when making up the unlawful 2016 waiver.  *See id.* at 882.

### C.     EPA's Policy Unlawfully Arrogates to Itself a Non-Textual Waiver Power

By refusing to adjust the 2020 standards to account for past retroactive exemptions, EPA's policy also impermissibly converts the exemptions into a waiver, contrary to the statute's text.  As discussed, the effect of leaving retroactive exemptions unaccounted for is to reduce the nationwide volume requirements, but Congress authorized EPA to "reduce" such requirements "only" in the "limited circumstances" specified in the statutory provisions for a "waiver," *National Petrochemical*, 630 F.3d at 149, such as where "implementation of the [statutory volume] requirement would severely harm the economy … of a State, a region, or the United States" or "there is inadequate domestic supply" of renewable fuel to meet the volume requirements, §7545($o$)(7), (8)(D).  In contrast, the "exemption" provision—as Congress labeled it—does not say that EPA may "reduce" the volume requirements, but rather authorizes EPA to determine merely that the compliance obligation "shall not apply to" a specific refinery because of a different, localized circumstance, namely, when compliance would cause the individual refinery "disproportionate economic hardship."  §7545($o$)(9)(A)(i), (B)(i).

"[T]he usual rule [is] that when the legislature uses certain language in one part of the statute and different language in another"—here, *exemption* versus *waiver*—courts and agencies must "assume[] different meanings were intended,"

35

*United States v. Monzel*, 641 F.3d 528, 533 (D.C. Cir. 2011). There is no reason to depart from that rule here. Indeed, as EPA has acknowledged, exemption petitions "are held to a different standard"—"economic hardship"—"than a waiver under severe economic harm." JAXX{Response.to.Comments.14}. Congress would not have "established the severe-harm waiver standard only to allow waiver" through exemptions "based on lesser degrees of economic harm." *Americans for Clean Energy*, 864 F.3d at 712 (quotation cleaned); *see also* §7545(*o*)(7)(A). EPA has no authority to rewrite the statute to convert its "exemption" power into a new "waiver" power. *See, e.g.*, *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 721 (D.C. Cir. 2016); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995).

## II.    EPA'S 2022 RFS RULEMAKING AND THE ENSUING LITIGATION DO NOT FORECLOSE THIS CHALLENGE

In discussions regarding the resumption of this case, the government indicated that it believes petitioners' challenge is moot. The government is incorrect. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *MOAC Mall*, 598 U.S. at 295 (quotation cleaned); *accord Sandpiper Residents Ass'n v. HUD*, 106 F.4th 1134, 1141 (D.C. Cir. 2024). Thus, an agency might render a challenge moot by withdrawing the challenged action or by aligning its position with the challenger's. *See, e.g.*, *Louie v. Dickson*, 964 F.3d 50, 55 (D.C. Cir. 2020) ("A challenge seeking

an agency's withdrawal of a notice becomes moot when the agency withdraws the notice.").

The 2022 Rule did not fully moot petitioners' petition for review. In the context of the RFS, this Court has recognized a distinction between "a direct challenge" to a policy governing the setting of RFS standards and a challenge to the *application* of the policy to set RFS standards for a specific year. *Growth Energy v. EPA*, 5 F.4th 1, 13 (D.C. Cir. 2021). Petitioners' challenge to the 2020 percentage standards as being too low because of EPA's failure to adjust them to make up past retroactive exemptions is now moot in light of EPA's revision of those standards through the 2022 Rule.

But petitioners' challenge to EPA's decision in the 2020 rulemaking to maintain its policy of not making up past retroactive exemptions is alive and well. The 2022 Rule neither withdrew this 2020 policy nor adopted petitioners' preferred policy. Rather, the 2022 Rule "reaffirm[ed]" the 2020 policy, including EPA's policy of adjusting standards to "account[] for a projection of subsequently granted SREs (i.e., expected retroactive exemptions), JAXX:1, JAXX:1{2022.Rule.39631,39632}, and its policy of *not* adjusting standards to account for previously granted retroactive exemptions that had never been accounted for, JAXX, XX-XX{2022.RTC.138,140-141} ("we do not believe we should account for past SREs by increasing the volumes")—the latter of which

petitioners challenge here.  Consistent with that policy, EPA has never adjusted any RFS standards to account for any retroactive exemptions granted for pre-2020 compliance years.

Moreover, the number of unaccounted-for past retroactive exemptions may increase in the future.  EPA's denials of more than 100 exemption applications were recently vacated.  *See Sinclair Wyoming*, 114 F.4th at 706-714; *Calumet*, 86 F.4th at 1137-1142.  If EPA concludes on remand that any of those exemptions should instead be granted, then, under EPA's current retroactive-exemption policy, EPA will not adjust any RFS standards to account for them.  Further, spurred by those judicial decisions rejecting EPA's exemption denials, small refineries have begun challenging other long-past exemption denials.  *See, e.g.*, *REH Co. v. EPA*, Nos. 24-1310 & 24-1311 (D.C. Cir.) (challenging EPA's denial of exemption for 2018 compliance year).  If those exemption petitions are eventually granted, EPA's current policy will not account for them, either.  And small refineries continue to petition for exemption routinely, *see* https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions, affording a continual supply of chances that an exemption will be granted retroactively but not accounted for under EPA's exemption-adjustment policy.

In sum, the controversy presented here remains live.  The challenged policy was not rescinded or canceled, and petitioners have never received the relief they

seek: a change in policy so that EPA will adjust RFS standards to account for previously granted retroactive exemptions that were not previously accounted for.

Circuit precedent supports this conclusion. For example, in *American Maritime*, the petitioner challenged an interim rule, and while the case was pending, the agency promulgated the final rule, which "reaffirm[ed] the findings discussed in the interim rulemaking and basically adopt[ed] the interim rule's bid augmentation regulation." 766 F.2d at 554. The Court held: "Although aspects of this litigation could also be resolved in a petition to review the final rule, [the] issuance of that rule does not moot [the] challenges …, which are equally applicable to the final rule and the interim rule." *Id.*; *see Motor & Equipment Manufacturers Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998) ("A challenge to a portion of a regulation that is unaffected by intervening amendments does not become moot by reason of those amendments."); *Union of Concerned Scientists v. Nuclear Regulatory Commission*, 711 F.2d 370, 377-379 (D.C. Cir. 1983) (challenge to predicate finding of interim rule not rendered moot by issuance of final rule predicated on same finding, even though "issue could also be resolved in a petition to review the final rule").

## CONCLUSION

The Court should grant the petitions and remand the Rule for EPA to revisit its unlawful policy.

Respectfully submitted,

/s/ Bryan Killian              /s/ David M. Lehn

Bryan Killian                David M. Lehn
Douglas A. Hastings          Cesar Azrak
MORGAN, LEWIS & BOCKIUS LLP  BOIES SCHILLER FLEXNER LLP
1111 Pennsylvania Avenue NW  1401 New York Avenue NW
Washington, DC 20004         Washington, DC 20005
(202) 739-3000               (202) 237-2727
bryan.killian@morganlewis.com dlehn@bsfllp.com

*Counsel for Clean Fuels Alliance America*  *Counsel for Growth Energy*

November 20, 2024

40

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's order of October 25, 2024, because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 8,531 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ David M. Lehn
DAVID M. LEHN

November 20, 2024

# ADDENDUM

**Page(s)**

**RELEVANT STATUTE**

42 U.S.C. §7545(*o*) ...............................................................Add.1

**DECLARATIONS**

Declaration of Emily Skor ......................................................Add.9

Declaration of Kurt Kovarik ..................................................Add.13

fere with the attainment by the area of a national primary ambient air quality standard (or a State or local ambient air quality standard) for any air pollutant other than carbon monoxide.

(B) The Administrator shall, upon demonstration by the State satisfactory to the Administrator, waive the requirement of paragraph (2) where the Administrator determines that mobile sources of carbon monoxide do not contribute significantly to carbon monoxide levels in an area.

(C)(i) Any person may petition the Administrator to make a finding that there is, or is likely to be, for any area, an inadequate domestic supply of, or distribution capacity for, oxygenated gasoline meeting the requirements of paragraph (2) or fuel additives (oxygenates) necessary to meet such requirements. The Administrator shall act on such petition within 6 months after receipt of the petition.

(ii) If the Administrator determines, in response to a petition under clause (i), that there is an inadequate supply or capacity described in clause (i), the Administrator shall delay the effective date of paragraph (2) for 1 year. Upon petition, the Administrator may extend such effective date for one additional year. No partial delay or lesser waiver may be granted under this clause.

(iii) In granting waivers under this subparagraph the Administrator shall consider distribution capacity separately from the adequacy of domestic supply and shall grant such waivers in such manner as will assure that, if supplies of oxygenated gasoline are limited, areas having the highest design value for carbon monoxide will have a priority in obtaining oxygenated gasoline which meets the requirements of paragraph (2).

(iv) As used in this subparagraph, the term distribution capacity includes capacity for transportation, storage, and blending.

**(4) Fuel dispensing systems**

Any person selling oxygenated gasoline at retail pursuant to this subsection shall be required under regulations promulgated by the Administrator to label the fuel dispensing system with a notice that the gasoline is oxygenated and will reduce the carbon monoxide emissions from the motor vehicle.

**(5) Guidelines for credit**

The Administrator shall promulgate guidelines, within 9 months after November 15, 1990, allowing the use of marketable oxygen credits from gasolines during that portion of the year specified in paragraph (2) with higher oxygen content than required to offset the sale or use of gasoline with a lower oxygen content than required. No credits may be transferred between nonattainment areas.

**(6) Attainment areas**

Nothing in this subsection shall be interpreted as requiring an oxygenated gasoline program in an area which is in attainment for carbon monoxide, except that in a carbon monoxide nonattainment area which is redesignated as attainment for carbon monoxide, the requirements of this subsection shall re-

main in effect to the extent such program is necessary to maintain such standard thereafter in the area.

**(7) Failure to attain CO standard**

If the Administrator determines under section 7512(b)(2) of this title that the national primary ambient air quality standard for carbon monoxide has not been attained in a Serious Area by the applicable attainment date, the State shall submit a plan revision for the area within 9 months after the date of such determination. The plan revision shall provide that the minimum oxygen content of gasoline referred to in paragraph (2) shall be 3.1 percent by weight unless such requirement is waived in accordance with the provisions of this subsection.

**(n) Prohibition on leaded gasoline for highway use**

After December 31, 1995, it shall be unlawful for any person to sell, offer for sale, supply, offer for supply, dispense, transport, or introduce into commerce, for use as fuel in any motor vehicle (as defined in section 7554(2)[8] of this title) any gasoline which contains lead or lead additives.

**(o) Renewable fuel program**

**(1) Definitions**

In this section:

**(A) Additional renewable fuel**

The term ''additional renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B) Advanced biofuel**

**(i) In general**

The term ''advanced biofuel'' means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

**(ii) Inclusions**

The types of fuels eligible for consideration as ''advanced biofuel'' may include any of the following:

(I) Ethanol derived from cellulose, hemicellulose, or lignin.

(II) Ethanol derived from sugar or starch (other than corn starch).

(III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

(IV) Biomass-based diesel.

(V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

(VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

---

[8] So in original. Probably should be section ''7550(2)''.

(VII) Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E) Cellulosic biofuel**

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[9] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term "renewable biomass" means each of the following:

(i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

(ii) Planted trees and tree residue from actively managed tree plantations on non-federal[10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal[10] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term "small refinery" means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term "transportation fuel" means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United

---

[9] So in original. The word "and" probably should appear.

[10] So in original. Probably should be "non-Federal".

States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

**(iii) Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

**(iv) Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B) Applicable volumes**

**(i) Calendar years after 2005**

**(I) Renewable fuel**

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

**(II) Advanced biofuel**

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

**(III) Cellulosic biofuel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

**(IV) Biomass-based diesel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

**(ii) Other calendar years**

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**

**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

(i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator

shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Admin-

istrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—
(i) supplies and prices;
(ii) blendstock supplies; and
(iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the

extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

(A) existing technologies;

(B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2)[11] on each individual and entity described in paragraph (2).

**(12) Effect on other provisions**

Nothing under this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

**(q)[12] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of

---

[11] So in original. Subsection (a) does not contain a par. (2).
[12] So in original. No subsec. (p) has been enacted.

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____ )

RFS POWER COALITION,                              )
                                                  )
      Petitioner,                          )
                                                  )     Case No. 20-1046
      v.                                   )     (and consolidated
                                                  )              cases)
ENVIRONMENTAL PROTECTION AGENCY and               )
MICHAEL S. REGAN,                                 )
                                                  )
      Respondents.                         )
_____ )

## <u>DECLARATION OF EMILY SKOR</u>

1.      I, Emily Skor, am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of the petitioner Growth Energy in the above-captioned matter.

2.      I serve as the CEO of Growth Energy, a position I have held since May 2016. Growth Energy is a national trade association dedicated to promoting the commercial production and use of renewable fuels, particularly conventional and cellulosic ethanol.

3.      Today, Growth Energy has 93 members, all of which produce and sell ethanol in the United States.

4.    In the national market for transportation fuel, renewable fuel—including the ethanol produced by Growth Energy's members—competes with petroleum-based fuel. Any renewable fuel that is used for transportation purposes displaces the petroleum-based fuel that would otherwise be used.

5.    Because RFS obligated parties participate in the *petroleum* industry—they are petroleum refiners and importers—they have a strong economic incentive to maximize the percentage of petroleum in transportation fuel and to minimize the percentage of renewable fuel in transportation fuel.

6.    RFS standards inherently restrict the scope of competition between petroleum and renewable-fuel producers. By defining the minimum percentage of transportation fuel that must be renewable fuel, the RFS standards exclude petroleum from that percentage of the market. Raising RFS standards expands the portion of the market from which petroleum is excluded; lowering RFS standards expands the portion of the market in which petroleum can compete with renewable fuel.

7.    In 2023, about 14.2 billion gallons of ethanol were used to comply with the RFS. That constituted about 68% of all renewable fuel used to comply with the RFS and about 95% of the renewable fuel used to comply with the RFS's "implied conventional" requirement (i.e., the difference between the total requirement and the advanced requirement). In 2024 and future years, ethanol is

projected to account for similar percentages of the renewable fuel used to comply with the RFS.

8.      In 2023, Growth Energy's members collectively produced about 9.5 billion gallons of ethanol in response to and largely to comply with the RFS. That constituted about 45% of all renewable fuel used to comply with the RFS and about 63% of the renewable fuel used to comply with the RFS's "implied conventional" requirement. In 2024 and future years, Growth Energy's members are projected to account for similar percentages of the renewable fuel used to comply with the RFS.

9.      For purposes of use in transportation fuel, the ethanol produced by each of Growth Energy's members and by other ethanol producers that are not members of Growth Energy is interchangeable. Thus, raising or lowering RFS standards affects each Growth Energy member in the same way and roughly proportional to their preexisting market share.

10.     If EPA were to adopt a policy of adjusting the national RFS standards to account for exemptions it did not previously account for (because they were granted after EPA had already set the RFS standards for the compliance year covered by the exemptions), EPA would set higher RFS standards in the future. Higher RFS standards—particularly a higher total RFS standard—would increase the demand for all renewable fuel, but especially for ethanol and particularly

conventional ethanol, which is by far the most common type of renewable fuel used to meet RFS standards. As a result, each member of Growth Energy would almost certainly sell more ethanol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge and information prepared by Growth Energy.

Executed this 20th day of November 2024.


Emily Skor

NOT YET SCHEDULED FOR ORAL ARGUMENT

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| RFS POWER COALITION, *et al.*  ) | |
| ) | |
| ) | |
| *Petitioners,*  ) | |
| ) | |
| v.  ) | No. 20-1046 (and |
| ) | consolidated cases) |
| UNITED STATES ENVIRONMENTAL  ) | |
| PROTECTION AGENCY,  ) | |
| ) | |
| *Respondent.*  ) | |

**DECLARATION OF KURT KOVARIK**

I, Kurt Kovarik, hereby attest as follows:

**Background**

1.    I am over 21 years of age and competent to make this declaration. The facts set forth in this declaration are based on both my personal knowledge and information gathered in the course of my business activities. I am submitting this declaration on behalf of Clean Fuels Alliance America ("Clean Fuels") in the above-captioned matter.

2.    I am the Vice President of Federal Affairs for Clean Fuels, spearheading its federal regulatory efforts. In this capacity, I am familiar with the

Renewable Fuel Standard program ("RFS") and EPA's implementation of that program.

3.    Clean Fuels is the national trade association representing America's first advanced biofuels, biodiesel and renewable diesel (collectively, "biomass-based diesel" or "BBD").  Both biodiesel and renewable diesel can be used as a replacement for petroleum diesel in existing engines, either on its own or blended with petroleum diesel in any percentage.

4.    Clean Fuels is comprised of biodiesel producers, feedstock and feedstock processor organizations, fuel marketers and distributors, and technology providers. The group works to create sustainable BBD industry growth through education, communication, government affairs, technical, and quality assurance programs.

5.    Clean Fuels members own and operate BBD facilities in the United States, and are registered to participate in the RFS program. They use renewable biomass to produce BBD, including, but not limited to, soybean oil, canola oil, distiller's corn oil, waste cooking oil, and animal fats.

6.    On behalf of its members, Clean Fuels has commented every year on EPA's implementation of the RFS and advocated for a practical, yet enforceable program. As relevant here, Clean Fuels submitted comments on EPA's Renewable Fuel Standards for 2020 and Biomass Based Diesel volume for 2021.

7.    Clean Fuels has also frequently participated in litigation regarding the RFS, both challenging certain aspects of EPA's implementation of the RFS and defending EPA against challenges by obligated parties.  Cases in which Clean Fuels has participated (many under its previous name, the National Biodiesel Board), include *AFPM v. EPA*, No. 17-1258 (D.C. Cir.), Coffeyville *Resources v. EPA*, No. 17-1044 (D.C. Cir.), *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017), *Nat'l Biodiesel Board v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016), *Monroe Energy v. EPA*, 750 F.3d 909 (D.C. Cir. 2014), and *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 30 F.3d 145 (D.C. Cir. 2010).

**The Impacts of EPA's 2020 Rule**

8.    EPA's Renewable Fuel Standards for 2020 and Biomass-Based Diesel Volume for 2021, which is commonly referred to as "the 2020 Rule," has harmed Clean Fuels' members by failing to account for the impacts of small-refinery exemptions.

9.    Because exempt small refiners do not need to comply with the requirements of the RFS, each small-refinery exemption reduces the volume of BBD, advanced biofuels, and total renewable fuels required under the RFS, unless EPA makes up those volumes in its annual rules.  To date, EPA has not accounted for the small refinery exemptions it has granted unless it grants them prior to finalizing its standards for a particular year.  EPA has granted almost all of its

small-refinery exemptions after finalizing the standards, including *all* of them for 2016 and later years.  EPA has therefore accounted for exactly zero small-refinery exemptions in those years.

10.    While EPA used a projection in the 2020 Rule to account for anticipated 2020 small-refinery exemptions, it did not account for any exemptions from prior years. Those prior-year exemptions are numerous.  In particular, EPA dramatically expanded its grants of exemptions beginning in 2016, including 19 for 2016, 35 for 2017, and 32 for 2018.

11.    As a result of those exemptions and EPA's failure to account for them, EPA's RFS volumes effectively required lower volumes of biofuels by billions of gallons.

12.    The impact was especially acute for BBD producers because BBD demand is driven by all three of the BBD volume, the advanced biofuel volume, and the total renewable fuel volume under the RFS. An analysis by Dr. Scott Irwin estimated that the collective impacts of small-refinery exemptions on the BBD, advanced biofuel, and total renewable fuel volumes resulted in lowered demand for BBD by over 900 million gallons in 2018 alone. *See* Scott Irwin, *Small Refinery Exemptions and Biomass-Based Diesel Demand Destruction*, Farmdoc Daily (9): 45 (March 14, 2019).

13.    In two actions in 2022, EPA reversed its prior policy and denied all of the exemption petitions for 2018 and denied other pending petitions for other years.  But, that decision was recently overturned by the D.C. Circuit in *Sinclair Wyoming Ref. Co. LLC v. Env't Prot. Agency*, 114 F.4th 693 (D.C. Cir. 2024).  On remand, EPA is likely to grant many or all of those exemptions again, which will lower demand for BBD in current years.

14.    In addition, because of the operation of the "RIN bank," exemptions granted in the past continue to impact current-year demand for renewable fuels. Obligated parties can carry forward RINs when they have already retired RINs in a past year, and then can continue to carry additional RINs forward to the next year. So, because there are RINs that are carried over year after year, there is a domino effect from past exemptions that continues to impact current-year demand for biofuels.

15.    The excess RIN bank due to past small-refinery exemptions and any new exemptions that EPA grants in response to the remand in *Sinclair* will both impact BBD demand in current years.  As noted in Dr. Irwin's analysis in 2019, BBD demand is impacted by reductions in each of the total renewable fuel, advanced biofuel, and BBD volumes.

16.    In 2023, Clean Fuels' members collectively accounted for over 61 percent of BBD production in the United States (over 73 percent of biodiesel and

over 54 percent of renewable diesel).  Clean Fuels' members are likely to account for similar percentages going forward.

17.    Biodiesel and renewable diesel are commodities.  So, while there are differences between biodiesel and renewable diesel, the market treats one gallon of biodiesel interchangeably with any other gallon of biodiesel and one gallon of renewable diesel interchangeably with any other gallon of renewable diesel.  So, the lowered BBD demand as a result of small-refinery exemptions for which EPA has not accounted will affect all of Clean Fuels' members similarly.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on November 20, 2024 in Washington D.C.



Kurt Kovarik

## CERTIFICATE OF SERVICE

I certify that on November 20, 2024, I filed a copy of this brief using the

Court's case management electronic case filing system, which will automatically

serve notice of the filing on registered users of that system.


/s/ David M. Lehn
DAVID M. LEHN


November 20, 2024