No. 20-1046

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

RFS POWER COALITION,

*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY AND LEE M. ZELDIN,

*Respondents.*

On Petition for Review of Final Agency Action
of the Environmental Protection Agency

## INITIAL REPLY BRIEF OF PETITIONERS

Bryan Killian
Douglas A. Hastings
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-3000
bryan.killian@morganlewis.com

*Counsel for Clean Fuels Alliance America*

David M. Lehn
Cesar Azrak
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727
dlehn@bsfllp.com

*Counsel for Growth Energy*

April 11, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

GLOSSARY...................................................................................... v

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ..................................................................................... 2

    I.    THE COURT SHOULD ADJUDICATE PETITIONERS' CLAIM ...................... 2

        A.    Petitioners' Claim Is Not Constitutionally Moot........................ 2

        B.    Judicial Review Is Otherwise Appropriate ................................ 7

    II.    EPA'S POLICY OF NOT ADJUSTING RFS STANDARDS FOR PAST RETROACTIVE EXEMPTIONS VIOLATES THE CLEAN AIR ACT .............. 13

        A.    The Policy Violates EPA's Core Mandate to Set Standards That "Ensure" the Required Volumes Are Met ....... 13

        B.    The Policy Produces Arbitrary and Capricious Standards ....... 21

        C.    The Policy Arrogates to EPA an Atextual Waiver Power ........ 21

CONCLUSION .................................................................................. 22

# TABLE OF AUTHORITIES*

Page(s)

**Cases**

*Alon Refining Krotz Springs, Inc. v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019) ..............................................................9

*American Fuel & Petrochemical Manufacturers v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ................................................. 9, 13, 15

*American Maritime Ass'n v. United States*,
  766 F.2d 545 (D.C. Cir. 1985) ....................................... 4, 5, 10

*American Petroleum Institute v. EPA*,
  706 F.3d 474 (D.C. Cir. 2013) ...........................................................19

*Chamber of Commerce v. Department of Energy*,
  627 F.2d 289 (D.C. Cir. 1980) .............................................................7

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) .........................................................6

*Community for Creative Non-Violence v. Hess*,
  745 F.2d 697 (D.C. Cir. 1984) .............................................................7

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ....................................................................9

*Gull Airborne Instruments, Inc. v. Weinberger*,
  694 F.2d 838 (D.C. Cir. 1982) ...........................................................12

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
  594 U.S. 382 (2021) ............................................................................12

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ..............................................................................8

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*MBIA Insurance Corp. v. FDIC*,
   708 F.3d 234 (D.C. Cir. 2013) ...........................................................7

*MOAC Mall Holdings LLC v. Transform Holdco LLC*,
   598 U.S. 288 (2023) .............................................................................6

*Monroe Energy, LLC v. EPA*,
   750 F.3d 909 (D.C. Cir. 2014) ............................................... 10, 16, 18

*Motor & Equipment Manufacturers Ass'n v. Nichols*,
   142 F.3d 449 (D.C. Cir. 1998) ...................................................... 3, 10

*National Petrochemical & Refiners Ass'n v. EPA*,
   630 F.3d 145 (D.C. Cir. 2010) ............................................... 10, 16, 18

*Sierra Club v. FERC*,
   827 F.3d 36 (D.C. Cir. 2016) ..............................................................8

*Sinclair Wyoming Refining Co. LLC v. EPA*,
   101 F.4th 871 (D.C. Cir. 2024) ("*Sinclair-Reset*")............... 2, 7, 9, 11, 13, 16-20

*Sinclair Wyoming Refining Co. LLC v. EPA*,
   114 F.4th 693 (D.C. Cir. 2024) ("*Sinclair-Exemption*") .............................. 7, 12

*Union of Concerned Scientists v. Nuclear Regulatory Commission*,
   711 F.2d 370 (D.C. Cir. 1983) ...................................................... 4, 5, 10

*Wynnewood Refining Co., LLC v. EPA*,
   77 F.4th 767 (D.C. Cir. 2023) ...........................................................9

**Statutes**

42 U.S.C.

   §7545(*o*)(2)(A)(i) ..................................................................... 9-10, 18

   §7545(*o*)(2)(A)(iii)(I) ................................................................... 9-10

   §7545(o)(2)(B)(ii) .............................................................................11

   §7545(*o*)(3)(B) ................................................................................18

   §7545(*o*)(3)(B)(i) ........................................................................ 8-11

§7545(*o*)(3)(C)(ii) ................................................................ 16-17

§7545(*o*)(5)(A)-(C) ...................................................................20

§7545(*o*)(5)(D) ...........................................................................20

§7545(*o*)(9)(C) ...........................................................................20

**Regulations**

40 C.F.R. §80.1405(c) (2021) ..................................................2, 6

40 C.F.R. §80.1405(c) (2023) .....................................................3

**Other Authorities**

Congressional Record Service, *The Renewable Fuel Standard (RFS):*
      *An Overview* (July 31, 2023) ......................................... 18-19

## GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |

## SUMMARY OF ARGUMENT

Petitioners' claim is not moot—constitutionally or prudentially. The challenged policy of refusing to adjust annual RFS percentage standards to account for *past* retroactive small-refinery exemptions (although EPA does adjust for *projected* retroactive exemptions) was adopted and codified through the 2020 Rule, and remains in effect. The 2022 Rule did not render this case moot because that rule "reaffirmed" the challenged policy. Petitioners did not "waive" their claim because they were not required to litigate it in the context of the 2022 Rule; to the contrary, agreeing to hold this case in abeyance and not asserting the claim in that later case allowed for conservation of litigants' and the Court's resources. And this Court can issue meaningful relief: vacating the policy would require EPA to account for past retroactive exemptions in its ongoing, annual process of establishing RFS obligations.

The challenged policy violates the Clean Air Act because it: (1) contravenes EPA's "core mandate" to set percentage standards reasonably designed to "ensure" the annual RFS volume requirements are met; (2) results in arbitrary and capricious RFS standards by causing EPA to blind itself to past retroactive exemptions' effect on those standards; and (3) converts exemptions into "waivers" of the national volume requirements, contrary to Congress's intent. EPA responds that the RFS is purely "forward-looking," but ignoring excess carryover RINs

created by past retroactive exemptions undermines the efficacy of future standards, and ignoring past renewable-fuel shortfalls created by past retroactive exemptions impedes attainment of the RFS program's overall volumes.  No statutory provision precludes EPA from adjusting standards for past retroactive exemptions or gives EPA discretion whether to do so.  And EPA's various concerns about the feasibility of such adjustments highlight the magnitude of its past failures and disregard the compliance flexibilities Congress provided.

## ARGUMENT

### I.    THE COURT SHOULD ADJUDICATE PETITIONERS' CLAIM

### A.    Petitioners' Claim Is Not Constitutionally Moot

1.      EPA's constitutional mootness argument rests on fundamental misunderstandings about the 2020 Rule, the 2022 Rule, and petitioners' claim.

The 2020 Rule adopted a policy of adjusting RFS percentage standards to account for *projected* retroactive exemptions but not for *past* ones, and codified that policy in the regulatory definition of the "standard equation," i.e., the formula for computing percentage standards.  *See Sinclair Wyoming Refining Co. v. EPA*, 101 F.4th 871, 881 (D.C. Cir. 2024) (hereinafter "*Sinclair-Reset*"); 40 C.F.R. §80.1405(c) (2021).  EPA concurrently applied the amended standard equation to determine the 2020 percentage standards, making no adjustment for the volume of renewable fuel covered by past retroactive exemptions.  *See* JAXX:2-XX:3{2020.Rule.7051-7053}; JAXX{2020.ResponseToComments.191}.

In the 2022 Rule, EPA fully "reaffirm[ed]" this policy and accordingly did not change the standard equation.  JAXX:1{2022.Rule.39631}; *see* JAXX:X-XX:X{2022.Rule.39631-39633}; JAXX, XX-XX{2022.ResponseToComments.138,140-141}; 40 C.F.R. §80.1405(c) (2023).  But the 2022 Rule revised the 2020 percentage standards in light of EPA's revised assessment of the volume of 2020 exemptions.  JAXX:3, JAXX:1-2{2022.Rule.39602,39633}.  Here, petitioners challenge the 2020 Rule insofar as it adopted the policy of *not* adjusting the percentage standards to account for *past* retroactive exemptions, which remains unaffected by the 2022 Rule.

2.      EPA's core argument is: "Because EPA took a fresh look at the issue, the 2020-2022 Rule is a *new* agency action."  Br.14.[1]  As this Court's precedents cited in petitioners' opening brief establish, however, that is irrelevant because the 2022 Rule "reaffirm[ed]" the 2020 Rule's policy without relevant alteration.  Biofuels.Br.36-37, 39.

That alone refutes EPA's attempt to distinguish *Motor & Equipment Manufacturers Ass'n v. Nichols*, 142 F.3d 449 (D.C. Cir. 1998), on the ground that "the challenged part of the 2020 Rule is not 'unaffected' by the []2022 Rule because the []2022 Rule reconsidered the relevant issue anew," EPA.Br.16-17.

---

[1] All quotations are cleaned unless otherwise noted.

3

EPA attempts to limit *American Maritime Ass'n v. United States*, 766 F.2d 545 (D.C. Cir. 1985), to "the unique relationship between an interim final rule and a final rule." Br.16. EPA fails to explain, however, why that relationship is materially different, and EPA's description of *American Maritime* applies equally here: during the final rulemaking, EPA "invit[ed] comments" on the rule, and "responded to comments and partially modified the rule, but not in any way that was relevant to the pending challenge." EPA.Br.16.

Similarly, EPA notes that *Union of Concerned Scientists v. Nuclear Regulatory Commission*, 711 F.2d 370 (D.C. Cir. 1983), involved the supposedly "closer" relationship between interim and final rules, and that the final rule there "rel[ied] on an unexamined predicate finding." EPA.Br.15. Neither feature, however, was a basis for the decision. Rather, the Court concluded that the interim rule's "finding retains its vitality" and thus "remains a live issue" even though the finding's validity "could also be resolved in a petition to review the final rule"—like the policy challenged here. 711 F.2d at 378-379.

3.      Contrary to EPA's assertion, EPA.Br.14-15, the relief sought is neither vague nor ineffectual. Petitioners seek not the invalidation of the 2020 percentage standards, but the invalidation of EPA's policy of not adjusting percentage standards to account for past retroactive exemptions. If the Court agrees with petitioners, EPA will have to conform its policy to that ruling and

apply its revised policy in future standard-settings regardless of the 2022 Rule, because EPA can never apply a policy that has been held to violate the Clean Air Act. Otherwise, *American Maritime*, *Union of Concerned Scientists*, and *Motor & Equipment* would have come out the other way because the agency could have stood by the later action despite judicial invalidation of the identical earlier action.

Moreover, correcting EPA's policy would have practical consequences because EPA has never adjusted any percentage standard to account for the billions of gallons' worth of retroactive exemptions granted before 2020, and because EPA could again grant more retroactive exemptions than accounted for under EPA's policy. *See* Biofuels.Br.38.

Intervenors counter that petitioners seek an "advisory opinion" in violation of the principle that courts "review challenges to an agency's 'final action,' not a 'policy' without operative effect." Intervenors.Br.6. But the policy at issue was adopted through a concrete action—the 2020 Rule—which codified the policy in the regulatory definition of the standard equation and which continues to dictate how EPA determines percentage standards. *See* 40 C.F.R. §80.1405(c). Petitioners challenge that action.[2]

---

[2] Contrary to intervenors' suggestion, Intervenor.Br.6, the Court could invalidate the challenged policy and remand the 2020 Rule without vacatur for

4.      Still, EPA contends that what changed between the 2020 Rule and the 2022 Rule was its "rationale" for the policy.  EPA.Br.13-14.  But the agency's rationale is irrelevant to mootness.  "A case becomes moot *only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295 (2023) (emphasis added).  Petitioners seek to change EPA's policy, not the underlying rationale.

Regardless, the 2022 Rule did not change EPA's rationale.  The rule stated: "the basic legal rationale for the modified definitions [in the standard equation] remains the same."  JAXX:1{2022.Rule.39632}.  With respect to EPA's policy of not accounting for past retroactive exemptions, EPA merely "expanded" its original explanation.  EPA.Br.14; *see* JAXX-XX{2022.RTC.137-141}.

## B.      Judicial Review Is Otherwise Appropriate

1.      Petitioners' claim is not "prudentially moot."  To start, that doctrine does not apply.  As EPA's own authorities say, a case is prudentially moot only where "there is no reasonable expectation that the wrong will be repeated," e.g., where the challenged "practice" is "undergoing significant modification so that its

---

reformulation, *see City of Port Isabel v. FERC*, 130 F.4th 1034, 1036 (D.C. Cir. 2025), or it could vacate the 2020 Rule while making clear that EPA's policy of accounting for *projected* retroactive exemptions remains valid.

ultimate form cannot be confidently predicted." *Chamber of Commerce v. Department of Energy*, 627 F.2d 289, 292-293 (D.C. Cir. 1980); *see also MBIA Insurance Corp. v. FDIC*, 708 F.3d 234, 245 (D.C. Cir. 2013); *Community for Creative Non-Violence v. Hess*, 745 F.2d 697, 701 (D.C. Cir. 1984).  Here, however, the policy remains and will govern all future RFS standard-settings. *Supra* p.XX.

Regardless, EPA's specific arguments are meritless.

a.    EPA says the administrative record is "stale" because EPA "provided more explanation when promulgating the 2020-2022 Rule" and EPA's 2020 analysis does not reflect the Court's subsequent decisions in *Sinclair-Reset* and *Sinclair Wyoming Refining Co. LLC v. EPA*, 114 F.4th 693, 701 (D.C. Cir. 2024) (hereinafter "*Sinclair-Exemptions*").  EPA.Br.17-18.  Thus, EPA says, this "case presents essentially a reverse-*Chenery* problem, where Petitioners can attack only the old grounds invoked by the agency."  EPA.Br.18.

The *Chenery* doctrine (reverse or otherwise) is irrelevant because petitioners' claim is that, properly interpreted (including in this Court's prior decisions), the Clean Air Act forecloses EPA's policy and requires that EPA adjust standards to account for past retroactive exemptions.  *See* Biofuels.Br.27-36; *infra* p.XX.  The *Chenery* doctrine does not apply to the "interpretation of [a statute] and binding [judicial] precedent" because those are not "determination[s] specially

7

entrusted to [EPA's] expertise." *Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016). Rather, "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024). Therefore, the Court must consider all arguments bearing on the Act's "best reading." *Id.* at 400.[3]

b.      EPA says the statutory "ensure" duty "is part of a time-limited provision"—i.e., 42 U.S.C. §7545(*o*)(3)(B)(i)—that "does not impose any obligations on EPA for compliance years after 2022." EPA.Br.19. EPA acknowledges that "[t]he statute uses the word 'ensure' in a few other provisions," but insists that petitioners "have waived any reliance on them." EPA.Br.19 n.5. EPA is mistaken.

Through multiple provisions, the Act imposes on EPA a continuing overarching duty to set percentage standards reasonably designed to "ensure" the national volume requirements are met throughout the operation of the RFS program, even after 2022—and that is the duty petitioners invoke, *see* Biofuels.Br.27-28, 31-32. Besides the duty to "ensure" under §7545(*o*)(3)(B)(i), the Act states: "*Regardless of the date of promulgation*, the [RFS] regulations …

---

[3] Even petitioners' contention that the challenged policy is invalid because it yields arbitrary and capricious percentage standards is purely legal, not a matter for arbitrary-and-capricious review. *See* Biofuels.Br.33-34; *infra* p.XX.

shall … *ensure* that the [national volume] requirements … are met."
§7545(*o*)(2)(A)(iii)(I) (emphasis added); *see also* §7545(*o*)(2)(A)(i) (EPA shall
"promulgate" and "revise the regulations … to ensure that transportation fuel sold
or introduced into commerce … contains at least the applicable volume of
renewable fuel").

Relying interchangeably on §7545(*o*)(3)(B)(i), §7545(*o*)(2)(A)(i), and
§7545(*o*)(2)(A)(iii)(I), this Court has long recognized this "core mandate: to ensure
the Act's annual renewable fuel volumes are met." *Wynnewood Refining Co., LLC
v. EPA*, 77 F.4th 767, 779 (D.C. Cir. 2023); *see also id.* at 781 ("core statutory
duty"); *Growth Energy v. EPA*, 5 F.4th 1, 7 (D.C. Cir. 2021) (citing
§7545(*o*)(2)(A)(i) for proposition that Act "tasks [EPA] with 'ensuring' that those
annual targets are met"); *Sinclair-Reset*, 101 F.4th at 877; *American Fuel &
Petrochemical Manufacturers v. EPA*, 937 F.3d 559, 568 (D.C. Cir. 2019); *Alon
Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 657 (D.C. Cir. 2019).
Additionally, the Court has repeatedly invoked "section 211(*o*)" generically and
§7545(*o*)(2)(A)(i), not §7545(*o*)(3)(B)(i), in holding that EPA can raise volume
requirements to make up for missed prior years because "Congress 'directed EPA
to "ensure" that "at least" the set volumes of renewable fuel were used each year'"
and because Congress was "'focus[ed] on ensuring the annual volume requirement
was met regardless of EPA delay.'" *Monroe Energy, LLC v. EPA*, 750 F.3d 909,

9

919 (D.C. Cir. 2014) (quoting *National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 156, 163 (D.C. Cir. 2010)).

EPA has said the same.  In modifying the standard equation to account for projected retroactive exemptions, EPA's 2020 Rule invoked this overarching "ensure" duty—interchangeably citing §7545(*o*)(3)(B)(i), §7545(*o*)(2)(A)(i), and §7545(*o*)(2)(A)(iii)(I)—because EPA was consciously revising the regulation to apply to *all* future RFS standard-settings, not merely through 2022.  JAXX:3 & nn.158-159{2020.Rule.7050}.  EPA's 2022 Rule did likewise in reaffirming that modification.  JAXX:2-JAXX:1 & nn.185-186{2022.Rule.39632-39633}.  Indeed, the 2022 Rule expressly stated that the revised standard equation "would in fact better 'ensure' that the volumes are met" if EPA "grant[s] SREs for some future compliance year," i.e., after 2022.  JAXX:1{2022.Rule.39633}.

Regardless, EPA is wrong about §7545(*o*)(3)(B)(i)'s "time limit."  The phrase "calendar years 2005 through 2021" only specifies when the establishment of percentage standards is no longer governed by the deadline specified in the preceding phrase: "Not later than November 30 of each of."  §7545(*o*)(3)(B)(i). For post-2022 calendar years, the Act establishes a different deadline: "no later than 14 months" before the year begins.  §7545(*o*)(2)(B)(ii).  Elsewhere, EPA has suggested the phrase "calendar years 2005 through 2021" temporally limits its duty to issue *percentage standards*, but that also makes no sense because the RFS could

10

not function without them, as EPA acknowledged when it decided to continue using them after 2022, JAXX:2-3{88.Fed.Reg.44519}—a decision expressly based on EPA's continuing, overarching "ensure" duty, JAXX:2{88.Fed.Reg.44519}.[4]

2.    EPA's contention that petitioners waived or forfeited their claim, or that it is barred by laches, because petitioners did not assert it in the litigation over the 2022 Rule, EPA.Br.20-21, is unsupported by any cited authority and contradicts *American Maritime*, *Union of Concerned Scientists*, and *Motor & Equipment.  See supra* pp.XX-XX.  As *Union of Concerned Scientists* said, it makes no sense to force the parties and the Court to "trudg[e] through this legal morass once again at a later date."  711 F.2d at 379.  And contrary to EPA's suggestion, EPA.Br.21-22, petitioners reasonably agreed to the abeyance here: if the Court sustained the obligated parties' challenge to EPA's policy of accounting for *projected* retroactive exemptions in *Sinclair-Reset*, that ruling would likely

---

[4] Intervenors are wrong that the Act's enumeration of factors on which to "base[]" post-2022 volume requirements, §7545(*o*)(2)(B)(ii), precludes EPA from accounting for past retroactive exemptions, Intervenor.Br.10-11.  First, such exemptions could be accounted for *either* by adjusting the required volumes determined through that factor analysis—the numerator in the percentage—*or* by adjusting the denominator, as EPA does for projected retroactive exemptions.  Second, EPA must also "base[]" post-2022 volume requirements "on a review of the implementation of the program," §7545(*o*)(2)(B)(ii), which could include past retroactive exemptions.  Finally, nothing in §7545(*o*)(2)(B)(ii) purports to foreclose the "ensure" duty that other text and structure show persists after 2022, as explained above.

have foreclosed petitioners' claim that EPA must also account for *past* retroactive exemptions. Additionally, the other proceedings that justified the abeyance—*Sinclair-Exemptions* and *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382 (2021)—could have significantly affected the importance of the policy challenged here by eliminating many past retroactive exemptions and largely foreclosing new ones.

Regardless, EPA identifies no "prejudic[e]" from petitioners' supposed delay—a fatal omission. *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982).

3.    EPA argues that petitioners also waived or forfeited their claim because "[t]hey never mentioned pivoting to a new challenge." EPA.Br.22. Petitioners' challenge is not "new." Because the 2020 Rule both adopted and applied the flawed policy, petitioners' initial challenge to the 2020 standards was one and the same as its challenge to the policy. Because the 2022 Rule replaced the 2020 standards but preserved the policy, petitioners' new opening brief rightly aimed solely at the policy. Accordingly, the merits arguments in Part I of petitioners' initial brief are substantially the same as those in petitioners' new opening brief and this reply; the differences merely reflect the Court's intervening decisions. *Compare* Biofuels.Initial.Opening.Br.13-23 *with* Biofuels.New.Opening.Br.27-36 *and infra* p.XX.

12

II.    **EPA'S POLICY OF NOT ADJUSTING RFS STANDARDS FOR PAST RETROACTIVE EXEMPTIONS VIOLATES THE CLEAN AIR ACT**

A.    **The Policy Violates EPA's Core Mandate to Set Standards That "Ensure" the Required Volumes Are Met**

1.    EPA defends its policy of refusing to account for past retroactive exemptions on the ground that "the annual standard-setting process is forward-looking." EPA.Br.26-27. That, it claims, distinguishes this policy from its policy of adjusting standards to account for *projected* retroactive exemptions. EPA.Br.29-30. That argument misunderstands both EPA's duties and petitioners' argument.

"[R]etroactive exemptions … hinder[] the achievement of the [national] renewable-fuel volumes," unless EPA "adjust[s]" the percentage standards to "account for" them. *Sinclair-Reset*, 101 F.4th at 881; *see* Biofuels.Br.7-8, 28-29. The timing of this exemption-induced "renewable-fuel shortfall," *American Fuel*, 937 F.3d at 571, 588, varies depending on the timing of the exemption and relevant market actors' reaction. The market might reduce renewable-fuel use during the exemption year, creating an immediate renewable-fuel shortfall. However, if the exemption was granted nonpublicly or after the covered year, *see* Biofuels.Br.9-10, as is more common, the market might use the originally required amount of renewable fuel in the exemption year but retire fewer RINs, creating an artificial

13

excess of carryover RINs for future years.  *See*

JAXX{Regulatory.Impact.Analysis.7(June2022).

The latter scenario happened when EPA suddenly granted many exemptions for 2016-2018 after the exemption years were past, causing the carryover RIN bank inflate by about 1.8 billion RINs.  JAXX Regulatory.Impact.Analysis.39(June2022).  EPA acknowledges this "increase in the carryover RIN bank is primarily the result of [retroactive] exemptions." JAXX:3{2020.Rule.7021}; *see also, e.g.*, JAXX Regulatory.Impact.Analysis.7(June2022); JAXX{Regulatory.Impact.Analysis.42(June2023)} ("an over-supply of D3 RINs caused by EPA granting a relatively large number of SREs for the 2017 and 2018 compliance years, lowering the effective RFS standards").  Inflating the bank in one year suppresses the effective renewable-fuel mandate in subsequent years because obligated parties can use the carryover RINs instead of new renewable fuel to comply—and they *will*, lest their carryover RINs expire.  JAXX n.15{2020.Rule.7021}.

Consequently, EPA's policy violates its "ensure" duty in two ways.  First, insofar as the RIN bank is inflated because of past retroactive exemptions, EPA's policy results in standards that necessarily will *not* "ensure" that the required volumes are met for the corresponding year.  Rather, the standards will *require*

only that the market use the nationally specified volume *minus* the carryover RINs from the prior exemptions.[5]  As EPA itself acknowledges, it "must set percentage standards that … are reasonably designed … to meet the target volumes for that upcoming year."  EPA.Br.27, 29; Biofuels.Br.34.  That was the basis for EPA's decision to account for *projected* retroactive exemptions, and this Court recognized that duty when it upheld that decision.  *See* Biofuels.Br.29-30.  EPA cannot perform that duty when it blinds itself to a RIN bank inflated by past retroactive exemptions and thereby knowingly sets percentage standards that will not require that the specified volume of renewable fuel be used.

Second, insofar as the exemptions caused a renewable-fuel shortfall in a prior year, EPA's policy results in standards that cannot "ensure" that the required volumes are met across the RFS' sweep.  *See American Fuel*, 937 F.3d at 571, 588 (failing to "adjust renewable fuel obligations to account for exemptions" "impede[s] attainment of *overall* applicable volumes" (emphasis added)).  Refusing to "eventually" make up past shortfalls by raising future standards is "flatly contrary to Congress' intent."  *National Petrochemical*, 630 F.3d at 156-157.  Raising future standards to recover past shortfalls "best … carr[ies] out

---

[5] Any renewable-fuel use above that level would be the market's *choice* and would replenish the carryover RIN bank for the next year, thereby perpetuating the bank despite carryover RINs' two-year lifespan.  *See* JAXX n.15{2020.Rule.7021}; JAXX{Regulatory.Impact.Analysis.37(June2022)}.

Congress' mandate that [EPA] 'ensure' the applicable volume requirement for [the past year] is met."  *Id.* at 163, 166; *see also Monroe Energy*, 750 F.3d at 920; Biofuels.Br.32.

EPA counters that this Court has recognized a duty to "ensure" that past volume requirements are met only when EPA "had never established standards at all" or had committed "a legal error" when setting prior standards.  EPA.Br.32. But this Court has deemed "unpersuasive" the notion that "the statute does not provide a true-up mechanism on the back end if things didn't go as planned." *Sinclair-Reset*, 101 F.4th at 893.  Rather, "the lesson of" this Court's precedents is that "EPA must ensure the applicable volumes are met," including by "increas[ing] later year volumes to make sure that volumes that should have been met in earlier years are eventually sold or introduced into commerce."  *Ibid.*

2.    EPA insists: "Congress required RFS standards to account for exemptions in one specific way," namely, under §7545(*o*)(3)(C)(ii).  EPA.Br.24-25.  As this Court concluded in rejecting a similar argument against EPA's policy of accounting for *projected* retroactive exemptions, §7545(*o*)(3)(C)(ii) "addresses a different issue": whereas §7545(*o*)(3)(C)(ii) "prevents *overcompliance* by crediting any renewable fuel use by exempt small refineries toward meeting the overall national volume requirements," making up retroactive exemptions—whether projected or past—"helps prevent *undercompliance* by ensuring that the leeway

16

afforded to small refineries does not lead to percentage standards that undershoot the target renewable fuel requirements." *Sinclair-Reset*, 101 F.4th at 891.

Nor does the absence of a similarly explicit provision for making up retroactive exemptions leave EPA "discretion" over *whether* to account for retroactive exemptions. EPA.Br.25. EPA may have discretion over *how* to do so, *see* Biofuels.Br.34 n.3, but EPA's *refusal* to do so cannot be squared with its core "ensure" mandate.[6]

3.      EPA says it cannot and need not "ensure with absolute certainty that the standards will result in the target volumes being met," EPA.Br.26-27, but petitioners' position does not require that. EPA (repeatedly) notes the example of "national consumption of gasoline and diesel turn[ing] out to be lower than expected" when the standards were set. EPA.Br.26-27; *see also* EPA.32-33. The Court, however, previously held that such inherent imprecision did not undermine EPA's policy of accounting for *projected* retroactive exemptions, *Sinclair-Reset*, 101 F.4th at 892, and the same is true with respect to past ones. Congress defined the operative obligations as percentages of transportation fuel, §7545(*o*)(3)(B), so Congress accepted that lower-than-projected transportation-fuel use would mean lower-than-expected renewable-fuel use. Whereas that imprecision is "a technical

---

[6] Intervenors' more extreme contention that EPA is prohibited from accounting for past exemptions, *see* Intervenor.Br.7-11, fails for the same reasons.

error inherent in the nature of projecting," *Sinclair-Reset*, 101 F.4th at 895, when EPA fails to account for past retroactive exemptions, it *knows ex ante* that the standards will not require the specified renewable-fuel use even if the projections are accurate. *See* Biofuels.Br.34.

4.      EPA frets about "standards that … exceed that year's statutory target," which "could not have been Congress's intent," EPA.Br.29, and which could "caus[e] great disruption in future years … if there is inadequate renewable-fuel production," EPA.Br.34. But as this Court has recognized, "Congress directed EPA to 'ensure' that '*at least*' the set volumes of renewable fuel were used each year." *Monroe Energy*, 750 F.3d at 919 (emphasis added; quoting §7545(*o*)(2)(A)(i)); *see also National Petrochemical*, 630 F.3d at 152-153, 156-157.

And EPA's practical concern misapprehends the situation. Adjusting standards for a RIN bank inflated by past retroactive exemptions would not require renewable-fuel use above the volume that would otherwise be required for that year; the inflated bank would perfectly meet the marginal requirement. Moreover, Congress "dramatically overestimated" *only* the growth in *cellulosic* biofuel production, *see Sinclair-Reset*, 101 F.4th at 878; *cf.* EPA.Br.34; for all other categories, production levels have met or exceeded RFS requirements substantially, Biofuels.Br.25; Congressional Research Service, *The Renewable*

18

*Fuel Standard (RFS): An Overview* 8 (July 31, 2023),[7] and production capacity is far greater still, *see* JAXX{88Fed.Reg.44485-86} (noting "significant" unused biomass-based diesel production capacity, with 3 billion gallons in additional capacity projected by 2026); JAXX:2, JAXX Table III.B.1{88Fed.Reg.44489,44491} (noting about 3.7 billion gallons in excess conventional-ethanal production capacity).  Regardless, EPA's ability to waive volume requirements because of inadequate renewable-fuel production supports petitioners' position by providing a "safety valve" for "an impossible position," *American Petroleum Institute v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013); it is not grounds to categorically relieve EPA of the duty to account for retroactive exemptions, *cf.* EPA.Br.20.  Insofar as Congress was not "single-minded" about "increasing renewable-fuel use," EPA.Br.30, the Act's waiver powers—available "only in limited circumstances"—define the boundaries, *Sinclair-Reset*, 101 F.4th at 896, not EPA's asserted atextual discretion to manage renewable fuel at volumes it deems appropriate.

EPA opposes any policy that would require a bank drawdown because, it claims, "the flexibility and liquidity created by carryover RINs is crucial to the proper functioning of the RIN market."  EPA.Br.34-35.  However, Congress did

---

[7] https://www.congress.gov/crs-product/R43325.

not create a perpetual bank; it merely specified that a person would "generat[e]" tradeable credits when it uses a "greater" amount of renewable fuel "than the quantity required"—i.e., when it uses *excess* renewable fuel—or when a small refinery "waives" its exemption. §7545(*o*)(5)(A)-(C), (9)(C). It cannot be that Congress intended to allow credit accumulation when the market uses *less* renewable fuel than required or when a small refinery *keeps* its exemption. Nor can it be that the RFS functions well only if the bank was inflated by prior retroactive relief. Indeed, Congress provided a different solution for RIN illiquidity: "any person that is unable to generate or purchase sufficient credits to meet [its RFS obligations may] carry forward a renewable fuel deficit." §7545(*o*)(5)(D). Congress certainly did not intend to undermine its own "market forcing policy" by allowing EPA to diminish volume requirements just to preserve carryover RINs—the tail does not wag the dog. *Sinclair-Reset*, 101 F.4th at 877.

Finally, EPA's focus on the magnitude of past retroactive exemptions (about 4.73 billion gallons of renewable fuel), EPA.Br.34, reflects EPA's belief that it should be allowed to shirk its core mandate forever because it shirked that mandate too much already. If EPA had responsibly adjusted standards immediately after granting retroactive exemptions to account for ensuing bank inflation, the market would only have had to use the nominally required amounts of renewable fuel all along. Anyway, EPA can spread the makeup across multiple future years. *See*

20

Biofuels.Br.34 n.3.  EPA should at least fix its policy to avoid worsening the

problem if it grants unprojected retroactive exemptions again.

### B.    The Policy Produces Arbitrary and Capricious Standards

EPA's policy is also invalid because it causes EPA to violate the principle of

reasoned decisionmaking when setting percentage standards by knowingly

disregarding the effect of a bank inflated by past retroactive exemptions on

whether the percentage standards will "ensure" that the required volumes are met.

*See* Biofuels.Br.33; *infra* p.XX.  EPA misses the point in insisting that it "knows of

those exemptions only in retrospect," EPA.Br.32: this case is about the policy EPA

applies when setting any year's RFS standards, by which point it will know of any

*past* retroactive exemptions.

### C.    The Policy Arrogates to EPA an Atextual Waiver Power

Responding to petitioners' contention that EPA's policy effectively

functions as an atextual waiver, *see* Biofuels.Br.35-36, EPA states: "the waiver

authorities … allow EPA in certain circumstances to directly reduce the nationwide

volumes," whereas "[t]he small refinery exemption provision does not,"

EPA.Br.33.  Precisely: EPA erases that distinction when it fails to adjust standards

to account for retroactive exemptions because that failure means, as EPA has said,

that the exemptions "effectively reduce the [nationwide] required volume."

JAXX:1{2020.Rule.7050}; *supra* p.XX.

21

Intervenors argue incorrectly that petitioners' position "transform[s] an exemption into a deferment, thereby depriving small refineries of previously granted exemptions."  Intervenor.Br.14.  Spreading the past exempt volume proportionally across all non-exempt obligated parties in the new year will generally raise the standards by a modest amount—around 5-10%, at most.  *See* Biofuels.Br.9.  But if that marginally increased obligation would cause a previously exempt small refinery disproportionate economic hardship, it may be exempted from *the new year's* standards.

## CONCLUSION

The Court should grant the petitions and remand the Rule for EPA to revisit its unlawful policy.

Respectfully submitted,

/s/ Bryan Killian
Bryan Killian
Douglas A. Hastings
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-3000
bryan.killian@morganlewis.com

*Counsel for Clean Fuels Alliance America*

/s/ David M. Lehn
David M. Lehn
Cesar Azrak
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727
dlehn@bsfllp.com

*Counsel for Growth Energy*

April 11, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's order of October 25, 2024, because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 4,539 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ David M. Lehn
DAVID M. LEHN

April 11, 2025

## CERTIFICATE OF SERVICE

I certify that on April 11, 2025, I filed a copy of this brief using the Court's

case management electronic case filing system, which will automatically serve

notice of the filing on registered users of that system.


/s/ David M. Lehn
DAVID M. LEHN


April 11, 2025